Appendix Exhibit 4   GERARD R. MADDREY

                UNITED STATES DISTRICT COURT

        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                        -  -  -

SCOTT H. KORN, et      :  CIVIL ACTION NO.

al.                    :  2:19-cv-00226-CMR

                       :

        vs.            :

                       :

CALIBER HOME LOANS,    :

INC. et al.            :

                    -  -  -

            THURSDAY, FEBRUARY 27, 2020

                    -  -  -

                ORAL DEPOSITION OF GERARD R.

MADDREY, taken pursuant to notice, was held

at the law offices of Mitts Law, LLC, 1822

Spruce Street, Philadelphia, PA 19103,

commencing at 10:01 a.m., before Kimberly S.

Gordon, a Registered Professional Reporter,

Certified Court Reporter and Notary Public.


                    -  -  -

        ELITE LITIGATION SOLUTIONS, LLC
                One Penn Center
        1617 J.F.K. Boulevard, Suite 340
        Philadelphia, Pennsylvania 19103
        www.elitelsllc.com ~ (215) 563-3703

GERARD R. MADDREY

Page 2

```
 1   APPEARANCES:

 2

 3          MITTS LAW, LLC
            BY:  GEOFFREY PAUL HULING, ESQUIRE
 4          1822 Spruce Street
            Philadelphia, Pennsylvania 19103
 5          215.569.1800
            ghuling@mittslaw.com
 6          Representing the Plaintiffs

 7
            BARNES & THORNBURG LLP
 8          BY:  ROBERT C. FOLLAND, ESQUIRE
            4540 PGA Boulevard, Suite 208
 9          Palm Beach Gardens, Florida 33418
            614.628.1429
10          rfolland@btlaw.com
            Representing the Defendants
11

12                      -   -   -

13

14

15

16

17

18

19

20

21

22

23

24
```

ELITE LITIGATION SOLUTIONS, LLC

Page 3

```
 1                        -  -  -

 2                    I N D E X

 3                        -  -  -

 4

 5   Testimony of:  GERARD R. MADDREY

 6

 7

 8   By Mr. Huling...........................6

 9

10

11                        -  -  -

12                    E X H I B I T S

13                        -  -  -

14   EXHIBIT NUMBER   DESCRIPTION   PAGE MARKED

15   Maddrey-1      Notice of Subpoena       25

16   Maddrey-2      Document titled Summary  68

17   Maddrey-3      Real Estate License      81

18   Maddrey-4      BPO Definition           84

19   Maddrey-5      11-page Document,        88

20                  Code of Ethics and

21                  Standards of Practice

22   Maddrey-6      2 Resumes                92

23   Maddrey-7      May 2017 e-mail string   94

24
```

GERARD R. MADDREY

Page 4

| 1 | EXHIBIT NUMBER | DESCRIPTION | PAGE MARKED |
|---|---|---|---|

1    EXHIBIT NUMBER   DESCRIPTION   PAGE MARKED

2    Maddrey-8      5-page Document,        128

3                   text messages

4    Maddrey-9      e-mail dated 6/28/17    142

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

GERARD R. MADDREY

Page 5

1                          -   -   -

2                 DEPOSITION SUPPORT INDEX

3                          -   -   -

4

5    Direction to Witness Not to Answer

6    Page    Line

7    None

8

9

10   Request for Production of Documents

11   Page    Line

12   None

13

14

15   Stipulations

16   Page    Line

17   None

18

19

20   Question Marked

21   Page    Line

22   None

23

24

GERARD R. MADDREY

Page 6

1                   -  -  -

2              GERARD R. MADDREY, after having

3         been first duly sworn, was examined

4         and testified as follows:

5                   -  -  -

6                   EXAMINATION

7                   -  -  -

8  BY MR. HULING:

9    Q.    Good morning, Mr. Maddrey.

10   A.    Good morning.

11   Q.    My name is Geoffrey Huling.  I'm an

12 attorney here at Mitts Law in Philadelphia,

13 Pennsylvania.  We represent Scott and Arlene

14 Korn in a case that's pending in the United

15 States District Court for the Eastern

16 District of Pennsylvania called Scott Korn,

17 et al. versus Caliber Home Loans, Docket

18 Number 19-cv-00226.  Welcome to our offices.

19   A.    Thank you.

20   Q.    Could you state your full name for

21 the record?

22   A.    Gerard Roy Maddrey.

23   Q.    And what is your present address?

24   A.    101 Jefferson Street, Bala Cynwyd, PA

GERARD R. MADDREY

Page 7

1    19004.

2    Q.    And what is your date of birth?

3    A.    11/18/76.

4    Q.    Have you ever been deposed before in

5    any case?

6    A.    A custody matter, yes.

7    Q.    Was it just that one time?

8    A.    One time.

9    Q.    And have you given testimony in a

10   courtroom before?

11   A.    A custody matter.

12   Q.    Same?

13   A.    Yes.

14   Q.    About how long ago was that

15   deposition and that testimony?

16   A.    I don't know.  It was eight years ago

17   maybe.

18   Q.    And you understand that you took an

19   oath to tell the truth today at this

20   deposition?

21   A.    Absolutely.

22   Q.    And you understand what that means?

23   A.    Correct.

24   Q.    And I just want to go over some of

GERARD R. MADDREY

Page 8

1    the ground rules.  Because you haven't done

2    this other than the one time and it was a

3    while ago.

4      A.    Right.

5      Q.    Everything we say here is being

6    transcribed by the court reporter to your

7    left and my right.

8      A.    Okay.

9      Q.    It's best for us and for her if only

10   one of us speaks at a time, so I will do my

11   best not to start asking you a new question

12   until you're completed answering the prior

13   question.

14     A.    Okay.

15     Q.    I'd ask you to wait until I've

16   finished my question until you start to

17   answer.

18     A.    Okay.

19     Q.    Is that okay with you?

20     A.    That's fine.

21     Q.    Also, because it's being

22   transcribed -- in a normal, everyday

23   conversation, there's plenty of nods,

24   gestures, "uh-huh", "uh-uh".  And I'd ask for

GERARD R. MADDREY

Page 9

1    the deposition that you try to avoid if you

2    can think of it and say "yes", "no".

3      A.    Okay.

4      Q.    Because sometimes "uh-huh" to one

5    person sounds like "uh-uh" to another one.

6      A.    I understand.

7      Q.    So we'll both try to do that.

8      A.    Got you.

9      Q.    Also, if you don't hear a question or

10   you don't understand a question, if I use a

11   word or a phrase that you're not familiar

12   with, please just tell me.  I'll repeat it.

13   I'll rephrase it.

14     A.    Okay.

15     Q.    I'm not here to trick you --

16     A.    Right.

17     Q.    -- or make your life difficult.  I

18   just want to ask questions and have you

19   answer to the best of your ability.

20           Also, along those lines, it's not an

21   endurance contest.  If you need a break, you

22   need to stretch your legs, you need to use

23   the restroom, you need water or coffee, --

24     A.    Right.

GERARD R. MADDREY

Page 10

1    Q.    -- just let me know.  Speak up.  We

2    can accommodate that.

3    A.    Okay.

4    Q.    The only thing I would say is if

5    we're in the middle of a question, if I've

6    already asked one, I'd ask that you answer

7    that before we take the break.  Do you

8    understand and agree to --

9    A.    Understood.

10   Q.    -- all this?

11   A.    Yes.

12   Q.    That's great.  What did you do to

13   prepare for today's deposition?

14   A.    I just went through the exhibit of

15   documents, the Exhibit A, and you have a list

16   of 24 items --

17   Q.    Right.

18   A.    -- you were asking for.  And I just

19   went through those items to do my best to put

20   together what I had and tried to answer those

21   questions.  That's it.  I don't -- you know.

22   Q.    And did you review those documents to

23   prepare or did you merely gather them?

24   A.    Well, I don't have many documents.

GERARD R. MADDREY

Page 11

1    So I reviewed what you were asking, and I --

2    I mean right off the bat I knew that I did

3    not have a lot of the things, many or the

4    majority of the things that you were asking

5    for.  They're not -- I don't own those things

6    to give to you.

7      Q.    And you're not represented by an

8    attorney here today, correct?

9      A.    No.  But should I be?  I mean I

10   didn't think it was anything -- you know,

11   I -- you know, okay.

12     Q.    Did you meet with an attorney as part

13   of preparing for today?

14     A.    I did not.  This is not my case.  I

15   don't really think I -- I think you're asking

16   me for a lot of things that -- I think your

17   assumption might be a little different than

18   what reality is in terms of my role and as

19   in -- but yes, no, because I knew I don't own

20   the communication you're asking for.

21     Q.    Did you talk with anyone else to

22   prepare for today's deposition or discuss the

23   case or the requests with any other person?

24     A.    No.  I didn't feel the need to.

GERARD R. MADDREY

Page 12

1    Q.    Where were you born, Mr. Maddrey?

2    A.    Delaware County.  Fitzgerald Mercy

3    Hospital.

4    Q.    Have you always lived in this area

5    then your whole life?

6    A.    Well, I was up State College for five

7    years for college.  After college, I was in

8    the New York area for a few years, North

9    Jersey actually, Paramus.  Then I moved back

10   to this market for work, and I've been here

11   ever since.

12   Q.    Where did you attend high school?

13   A.    Academy Park High School.

14   Q.    And what town is that in?

15   A.    Sharon Hill, PA.

16   Q.    And you attended college at Penn

17   State, I take it?

18   A.    Penn State Main.

19   Q.    And did you obtain a degree at Penn

20   State?

21   A.    Yes.

22   Q.    What did you get?

23   A.    Telecommunications.

24   Q.    Bachelor's degree?

GERARD R. MADDREY

Page 13

1    A.    Correct.

2    Q.    And what year did you graduate?

3    A.    1999.

4    Q.    Following college, your employment

5    history I'm interested in.  Is that when you

6    moved to the Paramus area?

7    A.    Yes.  That was -- I brought a resume.

8    I mean that was part of the, you wanted a

9    list of -- actually, it doesn't go back that

10   far.

11          So, yes, I went to Paramus, New

12   Jersey.  It was like an entry-level program

13   to get into telecommunication sales.  They

14   housed us up there.  All over the country we

15   came.  It was a group of college graduates,

16   new college graduates and they housed us, put

17   us through a pretty intense training program

18   up there, and from there, we were all

19   released to different markets.

20   Q.    And who were you working for at that

21   point?

22   A.    That was XO Communications.

23   Q.    And what type of work did you do

24   there?

GERARD R. MADDREY

Page 14

1    A.    It was sales, yes, Account Executive

2  sales.

3    Q.    What were you selling?

4    A.    Data, telephone service data,

5  business to business, you know, all the type

6  of communication you have in here to, you

7  know, dial up to one another and everything.

8  So, you know, just telecommunication stuff.

9    Q.    And how long did you work for them?

10 From when to when approximately?

11   A.    Yes.  Probably '99.  Probably worked

12 there about three years.

13   Q.    And what job did you have next

14 following that?

15   A.    I went to a company called Republic

16 Services.  They're a waste management

17 company.  I was an Account Executive there as

18 well.

19   Q.    And where were you based for that

20 job?

21   A.    That was in Chester, PA.  That was

22 where the office was.

23   Q.    And how long did you work for

24 Republic Services?

GERARD R. MADDREY

Page 15

1    A.    Couple years, yes.  Yes, it doesn't

2    go back that far.

3    Q.    Following that job, what was your

4    next employment?

5    A.    I owned a franchise, a local

6    franchise for buying and fixing up houses.  I

7    was a franchisee of Home Investors of

8    America.

9    Q.    And how long did you do that for?

10   A.    About five years, I believe.

11   Q.    Until about 2009 then?

12   A.    Yes.  I have '06 to '11 on my resume

13   here, but --

14   Q.    So let's move now to the last ten

15   years or so.  What was your next job starting

16   in 2011?

17   A.    Yes.  I was in, I got in software

18   sales, two different companies, 2011 and

19   2016.  That was RSI Logistics and Sungard

20   Availability Services.  It was like a

21   software solution.  One was for the

22   transportation industry.  The other one was

23   to hospitals, banks, governments, having like

24   an emergency preparedness plan in place.  Our

GERARD R. MADDREY

Page 16

1    software helped them manage that a little

2    better.  So that was up to --

3      Q.    And that was down here in the

4    Delaware Valley too?

5      A.    Wayne, PA.  Yes, King of Prussia and

6    Wayne.

7      Q.    And you stopped working there about

8    2016.  Is that right?

9      A.    Yes.  They actually -- yes, I stopped

10   working there.  They had a reorganization.

11   They sold the software division.  So we all

12   got severance packages and went our separate

13   way.

14     Q.    And where did you go next?

15     A.    I had started practicing real estate

16   pretty much full-time.

17           And by the way, through all the

18   history of employment, I've had a real estate

19   license since 2005.  So I've always done some

20   real estate on the side here and there.

21     Q.    I don't know that much about real

22   estate or licenses.  So when did you start

23   the process for getting that license?  So, if

24   you got the license -- I don't know if it's a

GERARD R. MADDREY

Page 17

1    month's long, year's long process.

2       A.    No, you take a credit -- there's some

3    education courses, prerequisites you have to

4    take, I think it's like 72 hours you have to

5    take, and then you're eligible to take the

6    state exam after that.  So I did all that in

7    2005.

8       Q.    All in the same year?

9       A.    I took the class, went to the -- you

10   know, I think it was Newtown Square

11   Associates.  Took the class over a month or

12   two, took the state exam and the national

13   exam, passed it, and obtained my license.

14      Q.    There's two?  There's a state exam

15   and a national exam?

16      A.    It's all one, but it's two parts.  So

17   you have to pass both parts.  If you pass

18   one, then you just got to go back and take

19   the other the next time you take it, but you

20   have to pass both parts.

21      Q.    You passed both in 2005?

22      A.    Correct.

23      Q.    And then once you passed, do you have

24   to do things to maintain your license in

GERARD R. MADDREY

Page 18

1   future years?

2     A.    Continuing ed classes.  You have to

3   take -- geez, they're due this year and I

4   need to take them.  I think it's 12 hours or

5   maybe -- it's 15 hours, I believe, every two

6   years to keep your license active.  And

7   whatever your broker where your license is

8   housed, whatever your broker requires of you

9   as well which, you know, it varies among

10  brokers.

11    Q.    And you worked for different brokers

12  over time?

13    A.    Yes, I have.

14    Q.    And have you kept your license active

15  ever since 2005 to the present?

16    A.    I think there was one period where it

17  wasn't for like a month or two.  Maybe when I

18  was working in software I wasn't doing a lot

19  of real estate but I probably just had to

20  complete some education requirements, and

21  after doing that, it was active again, yes.

22    Q.    So what broker are you presently

23  affiliated with?

24    A.    Called RealtyTopia.  They have an

GERARD R. MADDREY

Page 19

1   office in Bensalem and they have one

2   Downtown, but we all are remote.  Everyone

3   works kind of out of their houses.

4      Q.     And is real estate like currently

5   your full-time job or do you do --

6      A.     It is, yes.

7      Q.     -- other things as well?

8      A.     Yes.

9      Q.     For how long has real estate been

10  your full-time job?

11     A.     Since 2016.  Yes, 2016, Sungard.

12     Q.     How many brokers have you been

13  affiliated from 2016 to the present with?

14     A.     Two.

15     Q.     So the present one, --

16     A.     Right.

17     Q.     -- RealityTopia?

18     A.     RealtyTopia.

19     Q.     RealtyTopia?

20     A.     Correct.

21     Q.     And what was the prior one?

22     A.     Elite Premier Properties.

23     Q.     And how long were you affiliated with

24  Elite Premier Properties?

GERARD R. MADDREY

Page 20

1    A.    A couple years.  Let me see.  Well,

2    until this year actually -- no, until 2019,

3    2016 to 2019.  June 2019 it would be.

4    Q.    And since June 2019, it's been

5    RealtyTopia?

6    A.    Correct.

7    Q.    Any particular reason you switched

8    from one to the other?

9    A.    One reason is it's just higher

10   commission splits for the work that I do.  I

11   get 90 percent as opposed to 65 for the same

12   work.

13   Q.    It seems like a better deal.

14   A.    Right.

15   Q.    And when you say your work, what

16   exactly do you do?

17   A.    I do a lot of stuff in real estate.

18   I mean I'm involved in some like buying,

19   fixing up and reselling houses, which I guess

20   it doesn't involve -- it's part of my work, I

21   mean it's part of how I make money, but

22   that's not really with my license, involving

23   my license.  But after you fix it up and put

24   it back on the market, I do market my own

GERARD R. MADDREY

Page 21

1    properties.

2           I work with a few investors who are

3    just always looking for investment

4    properties, fixer-uppers, so I help them

5    locate properties that fit their criteria.

6           I list properties and represent

7    buyers, like most realtors do.  What else?

8    And that's on the sales and on the sales side

9    of the house.  I also, in some cases, will

10   represent some people looking for some rental

11   housing as well, both list and on the buyer

12   side.

13          And I also do evaluations for

14   different vendors which are mini appraisals,

15   if you want to call it that.

16          So a combination of things I do.

17   Very spread out.

18   Q.    You mentioned appraisals there at the

19   end.  Have you always --

20   A.    Well, they're not appraisals.

21   Q.    I'm sorry.

22   A.    And that's one thing that was -- with

23   this notice here, you keep mentioning

24   appraisals, appraisals.  If I was a licensed

GERARD R. MADDREY

Page 22

1    appraiser, I probably would have access to

2    all this information you have.

3          I'm just a real estate agent, and --

4    and I brought a definition of what I do for

5    them.  It's called -- they don't call it --

6    they're called BPO, broker price opinions.

7    They're not appraisals.  These are a report.

8    It's just prepared by a real estate agent

9    that estimates the value of a home, but

10   they're not appraisals from state-licensed

11   appraisers.  So it's a big difference just so

12   you know.

13      Q.    Just so I understand, within the real

14   estate industry, there are appraisers who

15   have to be state-licensed?

16      A.    State-licensed appraisers, correct.

17      Q.    You've never been an appraiser?

18      A.    No, I'm not an appraiser.

19      Q.    You've never --

20      A.    No.

21      Q.    -- tried to become an appraiser?

22      A.    No.

23      Q.    Never taken whatever exam it takes to

24   be an appraiser?

GERARD R. MADDREY

Page 23

1    A.    No.

2    Q.    Not done training or education

3    specific --

4    A.    No.

5    Q.    -- to being an appraiser?

6    A.    No.

7    Q.    But as a real estate agent, you've

8    done broker price opinions.  Is that what you

9    said?

10   A.    Yes, or evaluations, what they kind

11   of call them now.  But, yes, BPOs are what

12   I've done as a realtor, which is similar to

13   -- they're just our estimate of values, not

14   an appraisal.

15   Q.    I just have no -- how do broker price

16   opinions differ from appraisals?  What's

17   different about them?

18   A.    An appraisal is much more intense, a

19   lot more information.  You know, our

20   estimates of value is, you know, more in line

21   with a CMA that a realtor would prepare for

22   you if you're trying to sell your home and I

23   came to your house and I just had a few comps

24   in the neighborhood.  It's not an appraisal.

GERARD R. MADDREY

Page 24

1   They're night and day.

2        The cost for a BPO like depends if

3   it's a drive-by or an interior.  I mean

4   probably, you know, $60 to the price of an

5   appraisal would be 450.  It's, you know, it's

6   a big difference.

7   Q.    So the appraisals are more detailed?

8   A.    Yes.

9   Q.    They entail more work?

10  A.    And I'm not -- I can't tell you

11  everything in an appraisal report but we've

12  all had appraisals done, and you know, it's a

13  20-page report maybe.  You know, who knows,

14  but right.

15  Q.    And you've never prepared one of

16  those, an appraisal like that?

17  A.    No.  I'm not an appraiser, right.

18  Q.    You mentioned within broker price

19  opinions I guess there might be two different

20  things, a drive-by and an interior?

21  A.    It depends.  All of them are

22  different.  They ask -- yes, it depends.  The

23  instructions on all of them are different.

24  Some are only drive-bys where you take

GERARD R. MADDREY

Page 25

1   pictures of the outside.  Some you have to go

2   inside.

3     Q.    And are interiors more detailed and

4   costly than drive-bys?

5     A.    I wouldn't say any -- they're a

6   little more detailed.  You get to see the

7   interior condition, so that factors into it.

8           A drive-by you can only speculate,

9   you know, what the interior is, which is

10   usually average condition.  An interior might

11   uncover, you know, it might be below-average

12   condition, you know, after you see the

13   interior.  So, yes, you have more insight.

14     Q.    In your professional experience, have

15   you done more of one of those types than the

16   other, drive-bys versus interior?

17     A.    Drive-bys, yes, they're --

18     Q.    They're the most common, drive-bys?

19     A.    More, yes, you get more drive-bys

20   than interiors.

21     Q.    Let me show you what we'll have

22   marked as Exhibit-1.

23                     -  -  -

24     (Maddrey-1 marked for identification.)

GERARD R. MADDREY

Page 26

1                    -  -  -

2    BY MR. HULING:

3      Q.    So do you recognize what's been

4    labeled as Maddrey-1, Mr. Maddrey?

5      A.    Correct.

6      Q.    And is that the Subpoena that you

7    were served, that was served on you to appear

8    today --

9      A.    Yes.

10     Q.    -- back on I think February 12th you

11   were served?

12     A.    Yes, it looks to be the same.

13     Q.    And along with that, you were served

14   with a check, a witness fee check of some

15   sort.  Is that right?

16     A.    Yes.

17     Q.    And you deposited that check sometime

18   between when you were served with it and

19   today, correct?

20     A.    Correct.

21     Q.    Had you ever heard of this lawsuit

22   before being served with the Subpoena?

23     A.    No.

24     Q.    And you saw, I think you mentioned

GERARD R. MADDREY

Page 27

1    earlier, that your Subpoena came along with

2    24 categories of Document Requests?

3     A.    Correct.

4     Q.    And you were saying you searched your

5    records to try to see what you had to respond

6    to those, correct?

7     A.    Correct.

8     Q.    So what specifically did you do to

9    search for these items?

10    A.    Well, see, most of the stuff is

11   pertaining -- e-mail is one thing, but again,

12   a lot of these were pretty easy because I

13   don't have any -- I don't have contact, I

14   don't communicate with most of the -- I don't

15   have communications with -- I work for the

16   vendor, so I don't work directly for the

17   bank.  So I'm not even privileged -- I didn't

18   even know who the bank or anything was behind

19   any report I get typically.

20          So I don't, you know, I don't have

21   any contact with them.  My contact is with

22   the vendor.  The vendor might have

23   communication, but I definitely don't.  I'm

24   not even privileged to know who is behind

GERARD R. MADDREY

Page 28

1  ordering.

2    Q.    But for the things that you might

3  have had, you mentioned you searched e-mails.

4  Is that right?

5    A.    Correct.

6    Q.    And what did you do to search your

7  e-mails?  Did you put in search terms?

8    A.    Yes.  But here's the thing, I don't

9  work for Elite anymore and this was done way

10  back when, and I don't have access to Elite's

11  e-mails.  I don't --

12    Q.    Understood.

13    A.    Yes, I'm not an employee anymore so

14  that terminated all that.  I don't have any

15  communication from Elite or this actual

16  report on the -- I don't have access to --

17    Q.    Yes, that's all fine.

18    A.    Okay.

19    Q.    I'm just trying to gather, for the

20  things you might have had and that you found

21  some things, what you did to search for them.

22    A.    Yes.

23    Q.    You mentioned e-mails.  What did you

24  do to search your e-mails for those?  I

GERARD R. MADDREY

Page 29

1    understand it was a few years ago.  So how

2    did you try to locate the things that might

3    be --

4      A.    Just typing in the property address.

5    That would, you know, anything I had

6    regarding any property I've done a report on,

7    you know, it would be searchable by the

8    property address.

9      Q.    And you found some things by doing

10   that?

11     A.    No.

12     Q.    You did not?

13     A.    Elite is -- my Elite e-mails are

14   gone.  This was done -- I don't even know the

15   date that this was conducted, but no, I don't

16   have anything on Meadowbank in Villanova.

17     Q.    Did you search like paper, hard copy

18   records that you might have for any

19   information on this?

20     A.    There's no hard copy records.  All,

21   everything is done in the vendor system, and

22   the vendor owns the records for everything.

23         Like I said, if I was a licensed

24   appraiser, I would probably have to keep hard

GERARD R. MADDREY

Page 30

1    copies and records and files and stuff like

2    that, but I don't own it.  I just do the

3    report, I submit it in the system, and they

4    approve it and send it off to wherever they

5    -- you know, it's approved and sent off to

6    wherever it goes from there.  I'm not

7    privileged to have a record of that

8    information.

9       Q.    And am I understanding you correctly

10   it's solely electronic?

11      A.    Oh, yes, there's no hard copies.

12      Q.    And you don't print out a hard copy

13   of what you --

14      A.    I don't think you can.  I don't think

15   I can.

16      Q.    That was going to be my next

17   question, --

18      A.    I can't.

19      Q.    -- are you even able?

20      A.    Yes, no, I don't own it.  It's the

21   vendor that owns everything.  I do the report

22   and submit it.

23      Q.    So there's no requirement for real

24   estate agents to keep copies of broker price

Page 31

1    opinions that you print?

2    A.    No.  And that's why one of my

3    exhibits I just brought so you could see the

4    definition of a BPO which is just, you know,

5    very different from an appraiser.  I don't

6    own anything.

7            Again, we get paid, you know, 50 to

8    70 bucks probably for one of these things.

9    It's a quick turnaround, and you know, that's

10   it.  I don't have any --

11   Q.    So you personally never retain a

12   copy, electronically or in paper, of a report

13   like a broker price opinion?

14   A.    I don't, no.  It's all done in their

15   system, and once you submit it, it goes off

16   to where -- I don't have any records of

17   anything.

18   Q.    So how long did it take you to search

19   for what you might have of these 24

20   categories?

21   A.    Not long.  I mean I went through all

22   the points here.  I mean I can go through

23   them point by point.

24           I don't have contact with the banks.

GERARD R. MADDREY

Page 32

1    So Bank of America, Caliber --

2       Q.    We probably will, so I don't need you

3    to do that right now.

4       A.    Oh.

5       Q.    I just want to get a sense of --

6       A.    Countrywide.

7       Q.    -- if it took you a few days or an

8    hour.

9       A.    Oh, it didn't take long to go through

10   these points because I don't even know who

11   these people are.

12      Q.    Less than an hour then?

13      A.    Maybe about an hour.  And I typed all

14   this up.

15      Q.    And when did you do that?  You were

16   served with a Subpoena on February 12th.

17   It's February 27th today.  When did you do

18   the searching?

19      A.    I'm not sure.  Between the two dates.

20   I mean I just typed this up yesterday.  I

21   went through every point, but I read it and

22   saw what was asked of me.  I typed this up

23   yesterday.

24           But I did not -- yes, I'm not sure

GERARD R. MADDREY

Page 33

1    exactly when I physically did the search, but

2    I already know I don't have contact with --

3      Q.    Let's turn to some of the individual

4    requests then and ask the questions that way.

5            So the first request asks for all

6    documents within your possession that relate

7    to the relationship between you and Elite

8    Premier Properties/Elite REO Services on the

9    one hand and Plaintiffs, who are Scott and

10   Arlene Korn.

11           Did you have anything that was

12   responsive to that request?

13     A.    Wait.  Where are we at?

14     Q.    Under Document Requests.  I think

15   it's on the page numbered 8 within Maddrey-1.

16     A.    Right.  I just want to make sure

17   these are the same ones I wrote up.

18     Q.    Sure.

19     A.    Correct.  "All documents within Your

20   possession relating to" -- correct.

21     Q.    And I think you referred earlier to

22   Elite Premier Properties was your broker,

23   right?

24     A.    Former broker.

GERARD R. MADDREY

Page 34

1    Q.    Former broker.  And that was in the

2    2016 to 2019 period.  Am I right?

3    A.    Correct.

4    Q.    What is Elite REO Services?

5    A.    Same company.  They have a couple

6    different names, but the same company, yes.

7    Q.    And did you have a contractual

8    relationship with them?  Were you an

9    employee?

10   A.    No.  It's 1099.

11   Q.    You were an independent contractor?

12   A.    Independent contractor, correct.

13   Q.    Did you have any sort of agreement

14   that memorialized the terms under which you

15   were affiliated with them as an independent

16   contractor?

17   A.    Repeat that, please.

18   Q.    Sure.  Was there any written document

19   that set forth terms and conditions of your

20   relationship as an independent contractor for

21   Elite Premier Properties?

22   A.    Yes, probably.  Yes, there's

23   definitely some paperwork.  You know, when

24   you sign up for a broker, you have to sign to

GERARD R. MADDREY

Page 35

1    be an independent contractor for them.

2    That's with any broker.

3        Q.    Is that something you have possession

4    of?

5        A.    No, I do not.

6        Q.    Did you at one time?

7        A.    When I had access to the e-mail, yes.

8        Q.    It was on their company's system?

9        A.    Correct.  But I, again, once I

10   terminated, I didn't feel any need to --

11       Q.    You didn't have a hard copy of it?

12       A.    I don't, yes.

13       Q.    Did you have one at one time and

14   discarded it at some point?

15       A.    I mean I definitely had to read it

16   and sign it at one point, but yes, I don't

17   have it.  I don't have that.

18       Q.    To the extent you remember, what were

19   the sort of terms and conditions you had that

20   governed the relationship between you and

21   Elite Premier Properties?

22       A.    You know, the only thing that's

23   really worth noting is your commission splits

24   so, you know, if you close on the property,

GERARD R. MADDREY

Page 36

1    what the commission is, and I believe theirs

2    -- it depends on the type of deal and the

3    size of the deal, but you know, --

4    Q.    And was that, your split while you

5    were with them, was at 65 percent.  Am I

6    remembering what you said earlier?

7    A.    On some things.  It could be higher.

8    Like I said, it just depends on the size of

9    the deal.  So there were different tiers or

10   levels of splits, but I don't really remember

11   all those to be quite honest.

12   Q.    Do you remember the range of what was

13   the lowest it could be or the highest it

14   could be?

15   A.    You know, I'll take a guess, 65

16   maybe.  It could get as high as 80 maybe.

17   I'm not really sure.

18   Q.    And that's generated from the sale of

19   a property.  Am I right?

20   A.    Sale of a property and, you know, any

21   business you do with them under their

22   umbrella.  You know, everything you do is

23   subject to a split, yes.

24   Q.    So what other things would you do

GERARD R. MADDREY

Page 37

1    that could generate income for you to that

2    relationship besides selling a property?

3      A.    Represent the buyer; doing a BPO,

4    representing the buyer; rental, potential

5    rental client.  I mean whatever you did.  You

6    know, real estate related was everything goes

7    through the broker and everything is subject

8    to a split.

9      Q.    What sort of things did you do for

10   Elite Premier Properties that generated

11   income?  Like I'm interested --

12     A.    Everything I just named.

13     Q.    Can you break down those things like

14   by percentage?  Like from involving in

15   getting rental deals was 10 percent of what

16   you had.  Selling houses was 50 percent.

17   Doing areas -- I'm just making up numbers.

18   I'm just curious.

19     A.    Right.  I don't really have the

20   actual breakdown.  I mean I --

21     Q.    I understand you probably would need

22   to estimate.  I wouldn't expect you to

23   mathematically --

24     A.    Right.  You know, I did all of the

GERARD R. MADDREY

Page 38

1    above.  You're saying in terms of income?

2       Q.    Yes.  I'm interested to get a flavor

3    of is one of those areas the thing that

4    creates most of your income with them or not.

5       A.    The BPOs created a steady stream of

6    income even though it wasn't that -- you have

7    to do a good volume of them, but that was the

8    steady stream of income.  But I definitely

9    made probably more money selling homes.  You

10   know, it's just --

11      Q.    Because it is a bigger chunk of

12   money?

13      A.    Right.  Yes, I don't have that actual

14   split for you actually right now.

15      Q.    So you were affiliated with Elite

16   Premier Properties for about three years

17   total, is that correct, from --

18      A.    Correct.

19      Q.    -- 2016 to 2019?

20            Okay.  And you did, I'm gathering

21   from what you've said here today that you did

22   a pretty fair volume of these BPOs while you

23   were there, correct?

24      A.    Correct.

ELITE LITIGATION SOLUTIONS, LLC

GERARD R. MADDREY

Page 39

1    Q.    About how many?  Like would you do --

2    how many per month or per week?  I don't know

3    how you recall it.  But to the best of your

4    recollection, what sort of volume of these

5    did you perform when you were affiliated with

6    Elite Premier Properties?

7    A.    It could vary on the time of year,

8    but I mean maybe 10 to 15 maybe a week maybe.

9    Q.    10 to 15 per week?

10   A.    That's just an estimate.  I'm --

11   Q.    I understand you're estimating.

12   A.    One week it might not be any.  I'm

13   just trying to think what I -- you know, it

14   might not be -- it might be two, you know.

15   Who knows.  It just varies.  You don't have

16   any control of when you're going to get

17   solicited.

18   Q.    How did your relationship with Elite

19   Premier Properties begin?  How did you come

20   to be their independent contractor?

21   A.    I think I saw an ad.  I was looking

22   for a new broker and I saw an ad, and I

23   replied and talked back and forth with a few

24   people and decided to give it a go.

GERARD R. MADDREY

Page 40

1    Q.    Was there some person in particular

2    while you were affiliated with them that was

3    your supervisor or person you reported to?

4    A.    Well, no, I didn't have one person.

5    You know, they had different departments.  So

6    you call in.  It depends what type of

7    transaction it is.

8          Yes, I didn't really have one person.

9    It was the main receptionist.  I didn't have

10   to talk to them too much to be quite honest.

11   You don't really have to talk, you know, so

12   --

13   Q.    Did they, while you were affiliated

14   with them, did they maintain a physical

15   office or was it that you --

16   A.    They're in California.  Yes, they

17   don't have an office here in PA.

18   Q.    So you never went to an office --

19   A.    No.

20   Q.    -- when you were with them?  You

21   worked from home?

22   A.    Never met them in person, nothing.

23   Q.    You worked from your home?  Do you

24   have a home office?

GERARD R. MADDREY

Page 41

1    A.    Yes.

2    Q.    And do you know anything about the

3  relationship between Elite Premier Properties

4  and Bank of America?

5    A.    No.

6    Q.    Bear with me.

7    A.    Okay.

8    Q.    Do you know anything about the

9  relationship between Elite Premier Properties

10  and Countrywide?

11    A.    No.

12    Q.    Do you know anything concerning the

13  relationship between Elite Premier Properties

14  and Caliber?

15    A.    No.

16    Q.    Do you know anything about the

17  relationship between Elite Premier Properties

18  and Ocwen?

19    A.    No.

20    Q.    Do you know anything about the

21  relationship between Elite Premier Properties

22  and LSF9 Master Participation Trust?

23    A.    No.

24    Q.    Do you know anything about the

GERARD R. MADDREY

Page 42

1    relationship between Caliber and LSF9?

2       A.    No.

3       Q.    Do you know anything about the

4    relationship between Caliber and Bank of

5    America?

6       A.    No.

7       Q.    Do you know anything about the

8    relationship between Caliber and Countrywide?

9       A.    No.

10      Q.    Do you know anything about the

11   relationship if any between Caliber and

12   Ocwen?

13      A.    No.

14      Q.    Do you know a company called Clear

15   Capital?

16      A.    Yes.

17      Q.    What is the company Clear Capital to

18   your understanding?

19      A.    They're one of the vendors I work for

20   that I get solicited reports from.

21      Q.    Currently?  Previously?

22      A.    Still currently, yes.

23      Q.    And has that been true from 2016 to

24   the present?

GERARD R. MADDREY

Page 43

1    A.    For the most part, yes.

2    Q.    Is there a relationship between Clear

3    Capital and the brokers that you've worked

4    for?

5    A.    The previous broker Elite has a

6    program which they have some kind of training

7    program for people that are getting into

8    doing BPOs, and they might have a

9    relationship with Clear Capital bringing them

10   new realtors getting into BPOs.  That's how I

11   was introduced to Clear Capital.

12         But my current broker, no, I have the

13   relationship.  I'm the only one in the office

14   that's actually doing BPOs right now.  So I

15   had to sign-up on my own and do that.

16         Elite helps you sign-up with vendors

17   and stuff.  They introduce you to vendors,

18   and all the vendors I'm doing business with

19   now was a result of my introduction from

20   Elite even though I'm not with Elite anymore.

21   Q.    Right.  Okay.  You formed

22   relationships with some of those vendors, and

23   even now that you're with a different broker,

24   those relationships continue and help --

GERARD R. MADDREY

Page 44

1    A.    Correct.

2    Q.    -- generate work?

3    A.    Yes.  What I did was just change

4  brokers and, you know, still do business with

5  most of the same vendors.

6    Q.    Do you have a like contractual

7  relationship with Clear Capital like

8  directly?

9    A.    Contractual?  What do you mean by

10  that?

11   Q.    Is there any contract that you

12  signed?

13   A.    There's no contract, no.  You sign-up

14  as a person, a realtor.  You do have to meet

15  certain requirements -- I'm not sure about

16  Clear Capital if I need E&O insurance, but

17  you need certain things you have to submit.

18  They look at your application.  You got to

19  have a little experience doing it, you know,

20  doing these.

21       And, yes, they just look at your it's

22  like documents you submit, your broker's

23  license, your realtor's license, E&O

24  insurance, stuff like that, and they approve

GERARD R. MADDREY

Page 45

1   you or not to be a vendor.

2     Q.    Are you a --

3     A.    But there's no contract.

4     Q.    You're not an employee of Clear

5   Capital?

6     A.    No.

7     Q.    Are you an independent contractor

8   with respect to Clear Capital?

9     A.    No.

10    Q.    You don't get a 1099 from Clear

11  Capital?

12    A.    I don't get a 1099 from Clear

13  Capital.  Clear Capital, anything I make from

14  them, any money I make goes to my broker,

15  that's RealtyTopia now, and I get a 1099 from

16  my broker RealtyTopia.

17    Q.    And that 1099 would include on it the

18  compensation you earned from your

19  relationship with Clear Capital?

20    A.    And all the ten other, --

21    Q.    And everything else?

22    A.    -- every other -- the ten other

23  vendors I'm doing business with, correct.

24    Q.    And that was the same when you were

GERARD R. MADDREY

Page 46

1    at Elite Premier Properties?

2      A.    Oh, yes, absolutely.  That's how it's

3    set up.

4      Q.    So, while you were affiliated with

5    Elite Premier Properties, would you get

6    requests directly from Clear Capital to do a

7    BPO at a particular address?

8      A.    Yes.  Yes.  They come directly to me.

9    That's how it works.

10     Q.    When did your relationship with Clear

11   Capital begin?  When did you first start

12   doing work for them?

13     A.    In 2016 when I joined Elite.

14     Q.    Did Elite facilitate the introduction

15   of you to their vendor Clear Capital?

16     A.     Yes.  That's one of the, for someone

17   new joining Elite, that's one of the selling

18   points of -- you know, they focus on their,

19   one of their big focuses is BPOs.

20          So one of the things they do is they

21   have relationships with, you know, companies

22   all over the country that do BPOs, and so

23   they facilitate an introduction and help you

24   get, you know, up and running with those

GERARD R. MADDREY

Page 47

1   various vendors so we can focus on reports

2   and getting solicited by the vendors.  They

3   help us with all the administrative stuff.

4     Q.    So Clear Capital has that sort of

5   connection you just described to Elite

6   Premier Properties and I presume other

7   brokers all --

8     A.    You know, I'm not in the office, but

9   I know they help facilitate the introduction

10  to Clear Capital.

11    Q.    And then does Clear Capital also have

12  relationships then with various banks and

13  lenders?

14    A.    I don't know.

15    Q.    Do you know anything about the

16  relationship Clear Capital has or has had in

17  the past with Caliber?

18    A.    No.  Yes, I'm not -- that's -- I'm

19  down on this level.  I take pictures of the

20  properties and submit them, and it's out of

21  my hands.  I don't know what's happening with

22  the corporate offices here and there.  I'm

23  not privileged to that information.

24    Q.    So you don't --

GERARD R. MADDREY

Page 48

1    A.    Yes, that's not disclosed to me.

2    Q.    And you don't know the nature of the

3  relationship between Clear Capital and any

4  banks or lenders?

5    A.    No.

6    Q.    Did there come a time while you were

7  affiliated with Elite Premier Properties when

8  you conducted a BPO at 1233 Meadowbank Road,

9  Villanova, Pennsylvania?

10   A.    I assume so, yes.  I don't have the

11  records of it, but yes.  I assume, yes.

12   Q.    Was that in May of 2017?

13   A.    I guess so.  Like I said, I couldn't

14  pull any records of this, but if -- I'm

15  assuming, yes, or I wouldn't be sitting here.

16   Q.    Do you know if you have done more

17  than one BPO for that property at any time?

18   A.    I don't think so.  Again, I had to

19  Google the property to even know what -- and

20  by the exterior, you can't even see it like

21  from the main road.  So I don't really

22  remember.  It's in the Estate section of

23  Villanova so it's -- you know, that's a

24  high-priced area.

GERARD R. MADDREY

Page 49

1          But I've done several back there, but

2     I don't have the actual record of the actual

3     report.  If you have a copy, I'll look at it.

4     Q.    To the best of your recollection

5     then, the one and only time you've performed

6     a BPO --

7     A.    To the best of my recollection, I've

8     only been there once if --

9     Q.    And how did you get the assignment to

10    do that BPO back then?

11    A.    They come via e-mail --

12    Q.    Okay.  That's where I was going, but

13    you --

14    A.    -- or text.  I think it might be

15    both, and you know, when you get a new order

16    that is available to you, you accept it or

17    decline it.

18    Q.    What would go into your decision as

19    to whether to accept or decline an assignment

20    like that?

21    A.    Just depends on my workload if I

22    could meet the requirements and get it done

23    in time.

24    Q.    With respect to your relationship

GERARD R. MADDREY

Page 50

1    with Clear Capital or with Elite Premier

2    Properties, did you have any sort of quota or

3    goal that you had to do a certain number of

4    these?

5      A.    No.  No.  I think what happens is, if

6    I don't accept it within a certain time

7    period, it will go to the next person.

8      Q.    But it's completely within your

9    control as to --

10     A.    Correct.

11     Q.    -- whether you say "yes" or "no"?

12     A.    Yes.

13     Q.    Are there any bonuses for you if you

14   hit certain goals or do a certain number?

15     A.    No.  It's a flat rate per report and

16   it's usually offered up front when you're

17   solicited, and once in a while, you can call

18   in if it's like one way out in Cowtown

19   somewhere, like if it's real far, you can

20   call in and say, "Look, I'll do this, but the

21   fee has to be adjusted for me to drive all

22   the way out there".  So you try to negotiate.

23   If it works or not is a different story.

24          But, no, they give you a flat rate.

GERARD R. MADDREY

Page 51

1    It's offered up front.  It's usually

2    standard.

3      Q.    Do you remember what your flat rate

4    was you were getting back in May 2017 for

5    doing a BPO?

6      A.    It depends on the vendor.  Every

7    vendor was different.

8      Q.    How about for Clear Capital back in

9    May of 2017?

10     A.    I think the drive-bys were 40, and I

11   think the interiors were like 70.

12     Q.    And you mentioned that there might be

13   occasions when you could try to negotiate

14   that amount if it were say really far away

15   and it was inconvenient for you to go?

16     A.    Every now and then, yes.

17     Q.    This property wouldn't be one where

18   that happened, right?

19     A.    No.

20     Q.    And I guess I'm interested in what

21   sort of range could you negotiate with them?

22   Like if it was between 40 and 70 usually and

23   you had to travel really far, what would you

24   ask for to get for that?

GERARD R. MADDREY

Page 52

1    A.    You know what, it depends.  The only

2  time that has happened -- it hasn't really

3  happened with residential.  It happens on the

4  commercial side.  On the commercial side, I

5  go pretty far.  I will go pretty far because

6  they pay a lot more than residential pays.

7          So, you know, as a matter of fact, I

8  had to go to Williamsport.  This was maybe

9  two weekends ago.  And I think the initial

10  fee came in, it was only -- see, they weren't

11  asking for much information so the price

12  wasn't that high.  It was like 150.  But I

13  said, "For me to drive two and-a-half hours

14  out to Williamsport over the weekend, you're

15  going to have to increase the fee", and I

16  left it up to them.  I said, "You guys

17  usually treat me pretty fairly, so just

18  whatever you guys say it's fine".  And it was

19  a rush.  Somebody else did not do it or they

20  took the wrong picture or something and it

21  was a rush, so they asked me to complete it

22  like in a day turnaround.  So I think they

23  gave me another 125 on top of that.

24          But commercial and residential,

GERARD R. MADDREY

Page 53

1    completely different.  Commercial is -- you

2    get a lot more for commercial than you do

3    residential and depending on what you're

4    looking at, and that was a huge apartment

5    building.

6       Q.    And was that Clear Capital also, that

7    one a couple weeks ago that you were just

8    mentioning?

9       A.    It was, yes, but -- right.

10      Q.    And I think you said your best

11   estimate on the residential ones back in

12   2017 --

13      A.    Yes.

14      Q.    -- was like 40 for a drive-by, 70 for

15   an interior?

16      A.    Right.  And I don't know what it is

17   now.  I don't really do residential anymore.

18      Q.    When did you stop doing residential?

19      A.    I don't know.  A while ago when I

20   started focusing on -- I started focusing on

21   commercial.  Commercial had an opening.

22   Somebody retired who was working a lot of

23   stuff in this area, and they reached out to

24   the people in this area that, you know, --

GERARD R. MADDREY

Page 54

1    and it's just a better opportunity, you know,

2    in terms of compensation.  And, you know,

3    it's doing less you make probably more, you

4    know.  Less reports you make a lot more, you

5    know.  So it's just a better opportunity for

6    me.  And that was about maybe a year, over a

7    year and-a-half ago I stopped doing

8    residential for Clear Capital.

9        Q.    Did you do both residential and

10   commercial while you were with Elite Premier?

11       A.    Well, at different points in time,

12   yes, yes, but the focus -- once commercial

13   jumped in and that started being consistent,

14   the residential I had stopped doing that a

15   while ago.

16       Q.    But Clear Capital provides

17   opportunities to do both residential and

18   commercial.  Is that right?

19       A.    They do.  I don't even get solicited

20   for residential anymore, but yes.

21       Q.    But back in May of 2017, you were

22   doing more of that?

23       A.    I was obviously still doing

24   residential.  I mean I -- yes.  I don't think

GERARD R. MADDREY

Page 55

1    I was doing commercial yet.  I think that

2    maybe came later in the year or maybe the

3    beginning of 2018, somewhere around there.

4       Q.    So you said you weren't sure whether

5    it was e-mail or text or both.  But when you

6    got a, I don't know, what do you refer to it

7    as, an offer, an opportunity to conduct one

8    of these BPOs?

9       A.    Solicited.  You know, that goes out

10   to a lot of people, so you either accept it

11   or you won't.  If you wait, you won't --

12   somebody else will pick it up before you.

13      Q.    Did those come from a particular

14   person at Clear Capital or is it just an

15   automated --

16      A.    It's an automated thing that probably

17   goes out to all their vendors, yes.

18      Q.    Do you have any specific recollection

19   yourself of getting this solicitation for the

20   BPO at 1233 Meadowbank Road back in May of

21   2017?

22      A.    No, I have no particular

23   recollection.

24      Q.    Through searching for the documents

GERARD R. MADDREY

Page 56

1    in the Subpoena, thinking about getting ready

2    for today's deposition, have you had your

3    recollection refreshed in any way about the

4    actual BPO that you conducted on this

5    property?  Do you have a recollection of it?

6      A.    No.  I looked at the property online.

7    I know, you know, -- again, I've been back

8    there.  That's the Estate section of

9    Villanova.  I've been back there for many

10   different reports for many vendors.

11            So I know the area.  I don't

12   particularly remember the house.

13     Q.    So you've done other ones since and

14   maybe before --

15     A.    Yes.

16     Q.    -- in that neighborhood --

17     A.    Right.

18     Q.    -- or area?

19     A.    Yes, I know where it's at.

20     Q.    But not that particular property?

21     A.    Correct.

22     Q.    And do you remember whether the BPO

23   that you did back in May 2017 for the 1233

24   Meadowbank Road property was a drive-by or an

Page 57

1    interior, do you remember?

2      A.    No.  Yes, I didn't have anything on

3    that report, and I could not really see it

4    from the Google street view.  It was a bunch

5    of trees.

6      Q.    So I'm not trying to put words in

7    your mouth.  I'm trying to understand.  Do

8    you remember whether it was a drive-by or an

9    interior?

10     A.    I don't remember the report, no.

11     Q.    You don't recall then ever being in

12    the interior of that property?

13     A.    No.  I was looking for pictures, but

14    I mean I literally go through thousands,

15    hundreds of properties.  I wouldn't remember

16    back then anyway.

17     Q.    When you received the solicitation

18    back in May of 2017 from Clear Capital to do

19    a BPO and you accepted one, --

20     A.    Okay.

21     Q.    -- did you have a certain amount of

22    time that you were required to do it within?

23    How did that work?

24     A.    Well, the turnaround typically, I'm

GERARD R. MADDREY

Page 58

1   just saying on the drive-by is typically two

2   days.

3      Q.    If you don't complete it within two

4   days, it could be solicited to somebody else?

5      A.    It could be late or rerouted to

6   somebody else.  But, no, you don't accept

7   something you -- I mean, if you're doing

8   them, you got a process in place to go ahead

9   and get it done within two days.  It's not an

10  issue.

11          It's not a lot of information you're

12  putting together for these reports.  Usually,

13  a drive-by is, for a residential, is usually

14  six comps, three active, three sold,

15  typically in average condition in that

16  particular neighborhood.  It's not really --

17  it doesn't take a lot of time to complete

18  them.  The biggest thing is really scheduling

19  your time to get out there to take the

20  picture.

21     Q.    And is the time frame different for

22  the interiors as opposed to the drive-bys?

23     A.    It can be, yes.  Interiors are

24  different.  Interiors you have to set an

GERARD R. MADDREY

Page 59

1    appointment with --

2      Q.    With whoever is occupying the

3    property?

4      A.    It depends though.  If it's vacant,

5    it might be on a lockbox.  It could be listed

6    with a realtor.  You call the realtor.  They

7    say, "Go ahead in.  It's vacant.  It's on a

8    lockbox.  You just go".  Sometimes people may

9    work that you may have to go in their home

10   after.  You got to work around people's

11   schedules.  An interior could be -- it

12   depends on the situation.

13     Q.    You said that the turnaround time for

14   the drive-bys is usually two days.  Is there

15   a time on the interiors?  A week?  A month?

16     A.    It depends on when the appointment is

17   to get in.  So the first thing you do with an

18   interior is you set the appointment, and

19   after you set the appointment, like let's say

20   we set an appointment for Friday, then it

21   might be due Saturday or, you know, it

22   depends on when the appointment is set.

23     Q.    And do you set the appointment or

24   does Clear Capital set the appointment?

GERARD R. MADDREY

Page 60

1    A.    I do.  I call the point of contact,

2    the POC.

3    Q.    And is the point of contact like the

4    occupant of the property who would get you

5    access for an interior?  Is that what you

6    mean?

7    A.    Yes.

8    Q.    Do you remember having contact with

9    either Scott or Arlene Korn with regard to

10   setting up an appointment to do a BPO at 1233

11   Meadowbank Road?

12   A.    I don't remember.

13   Q.    Do you recall ever meeting Arlene

14   Korn at any time?

15   A.    I don't remember her.  Yes, I don't

16   remember either one of them.  I looked them

17   up.

18   Q.    That was going to be my next

19   question.  Do you recall meeting or --

20   A.    I Googled them.  I don't remember

21   meeting him or Arlene.

22   Q.    I didn't get the question out.  I'm

23   sorry.  I think we're -- I'll try to make

24   sure you're finished.

GERARD R. MADDREY

Page 61

1            So you have no recollection of ever

2    meeting or speaking to Scott Korn at any

3    time?

4       A.    I don't recall.

5       Q.    And do you have any recollection of

6    ever meeting or speaking to Arlene Korn at

7    any time?

8       A.    I don't recall.  I don't -- I can't

9    recall.  However, if -- you know, I'm -- I

10   don't recall.

11      Q.    And you don't remember whether the

12   BPO you did for this 1233 Meadowbank Road

13   property was a drive-by or an interior,

14   correct?

15      A.    No.

16      Q.    And you have no specific recollection

17   of either for this property?

18      A.    Yes, not unless you can show me the

19   report.

20      Q.    So tell me, in the May 2017 time

21   period, what would be entailed in you doing a

22   drive-by BPO?  Like take me through it step

23   by step of how you do one.

24      A.    You go to the -- drive up, find the

GERARD R. MADDREY

Page 62

1    address, and you take a few photos.  It

2    depends on the vendor what they're requiring,

3    but usually it's street scene, one looking

4    down both sides of the street; they want the

5    address to make sure you're at the property;

6    the front of the property; maybe the sides if

7    you can get them.  That's about it.

8       Q.    Do you recall any other --

9       A.    Maybe across the street too.  It

10   depends.  They ask different things.

11      Q.    Do you recall any other requirements

12   that Clear Capital had for a drive-by --

13      A.    No.

14      Q.    -- one?

15      A.    That's usually it.  Just some

16   exterior pictures, street scenes, front,

17   address.  Not too much.  It's pretty quick.

18      Q.    And besides taking the photographs,

19   are you also looking and analyzing anything

20   about the property yourself to formulate what

21   you're going to do for the BPO?

22      A.    I mean, if it's some obvious, like if

23   I'm in Philadelphia and the property is

24   boarded up or something, I mean you can make

GERARD R. MADDREY

Page 63

1    obvious assumptions that this house may be in

2    poor condition or certain condition rating

3    based on how it looks from the outside.  I

4    mean you can make some assumptions, but I

5    mean in most cases, you know, --

6        Q.    Any other things you're looking for

7    other than the general condition?

8        A.    No.  I mean whether it's occupied or

9    not is a different, you know, is also

10   relevant.  Because that's a question in the

11   orders.

12       Q.    And about how long does it take to

13   conduct a drive-by BPO?  Once you're at the

14   property area, how long does it take you?

15       A.    Not long.  A minute, two minutes.  I

16   mean not long at all.

17       Q.    So let's talk about interior ones

18   then.  So, in an interior BPO from Clear

19   Capital back in May of 2017 say, you've

20   arranged an appointment, you set one up, you

21   show up at the property, you get access to

22   the property.  What do you do to conduct an

23   interior one from that point?

24       A.    Interior?  You take pic- -- it

GERARD R. MADDREY

Page 64

1    depends on the vendor, but get a picture of

2    almost every room you can get in unless it's

3    something crazy going on in the room they

4    don't want you to go in.  But you just take

5    interior photos, kitchen, baths, bedrooms.

6    You know, you go through and you kind of get

7    a glimpse of every room in the house, and you

8    also look for damages sometimes.  You know,

9    if it's an obvious hole in the ceiling, maybe

10   a roofing issue, you can note damage.  And

11   that's about it.

12      Q.    So similar to the other but you're

13   now on the inside --

14      A.    On the inside, correct.

15      Q.    -- so you can observe more about the

16   condition?

17      A.    Correct.

18      Q.    And anything else you're looking for

19   or you're analyzing when you're doing an

20   interior one?

21      A.    I mean there's certain -- I mean, you

22   know, whether -- just the overall condition.

23   You know, flooring.  The walls are -- I mean

24   just you're comparing these to similar

GERARD R. MADDREY

Page 65

1   properties so you want to make sure you're,

2   you know, not comparing it to something that

3   it's not comparable to.

4           So you're noting the -- but the

5   pictures, you know, give you a good idea of

6   everything and you go and compare to similar

7   properties in the neighborhood and you put it

8   together.

9   Q.    Whereas you said a drive-by one might

10  take a minute or two, how long does an

11  interior one usually take?

12  A.    It depends on the property.  You

13  know, if it's a three-bedroom row house, you

14  know, you can be in and out of there in 5, 10

15  minutes, 15 minutes maybe.  Again, it depends

16  on the condition and what you got to take

17  notes of.

18  Q.    Does it ever take longer than

19  20 minutes?

20  A.    It depends.

21  Q.    Sometimes it does?

22  A.    It could, yes.  It depends if it's --

23  it depends.  It just depends.  Like I said,

24  if it's a vacant house, you can usually go

GERARD R. MADDREY

Page 66

1    through that pretty quickly, but if there's

2    people in there and kids in the bedrooms and

3    stuff, they got to get up and move out the

4    room.  You know, they can't be in the

5    pictures.  So it just depends on the

6    circumstances when you go.

7       Q.    So do you have any recollection

8    whether the BPO you did for 1233 Meadowbank

9    Road there was anything you did with respect

10   to that BPO that you don't customarily do

11   with any other BPO?

12      A.    No.

13      Q.    And was there anything that you

14   didn't do with respect to the BPO at 1233

15   Meadowbank Road that you customarily do do?

16      A.    No.  No.  Regular -- all of them are

17   kind of -- I mean there are instructions on

18   all of them, but most of them are pretty much

19   the same.

20      Q.    Let's turn to -- you brought

21   documents with you today in response to the

22   various requests you said?

23      A.    I did.

24      Q.    Do you have just one copy of those?

Page 67

1    A.    Yes.  I got another one, but I kept

2    that in the car.

3    Q.    And it looks to me -- is it that

4    stack right there in front of you?

5    A.    It is.  I mean it's really just the

6    answers to this and some of the documents you

7    requested.

8    Q.    Sure.

9    A.    Like, you know, I threw a few things

10   in here because you keep referencing

11   "appraisal".  An appraisal would have --

12   Q.    No, I think that might be helpful.

13   Yes.

14   A.    An appraisal probably would have this

15   type of information you're asking for, and

16   you asked for a resume and some other stuff.

17   It's nothing really.

18   Q.    What I'd like to do, if you don't

19   mind, is take a short break and there's a

20   photocopier right there and I'll make a copy

21   so Mr. Folland can have a copy, I can have a

22   copy, I can give you back what you brought

23   with you, and there will be a copy for the

24   court reporter that if I'm asking you

GERARD R. MADDREY

Page 68

1   questions we can put a sticker on them and

2   use them as exhibits.  Will that be okay?

3    A.    Yes.

4    Q.    Let's take that short break.

5                     -  -  -

6    (A recess occurred from 11:09 to 11:14.)

7                     -  -  -

8   BY MR. HULING:

9    Q.    So we've had a chance to photocopy

10  the documents that you brought with you

11  today.  I'd like to label the first one in

12  that group as Maddrey-2.

13                    -  -  -

14   (Maddrey-2 marked for identification.)

15                    -  -  -

16  BY MR. HULING:

17   Q.    So is this document Maddrey-2 that

18  has Summary at the top, is that something you

19  created yourself in preparation for this

20  deposition?

21   A.    It was -- I was just -- correct.  I

22  was just trying to let you know I'm not an

23  appraiser.  You know, this type of stuff

24  you're asking probably is more, the stuff

GERARD R. MADDREY

Page 69

1    you're asking for is probably more relevant

2    to an appraiser.

3           I don't, like I said, have these

4    documents or communications, and I don't have

5    any contacts with banks.  So that was really

6    my purpose in writing that.  Like, I didn't

7    understand my role here.

8      Q.    So the numbered paragraphs on this

9    page of the exhibit correspond to the

10   Document --

11     A.    Correct.

12     Q.    -- Requests that were attached to

13   your Subpoena, correct?

14     A.    Right.  And to my ignorance, I

15   thought I was just dropping this off today to

16   be quite honest.

17     Q.    Yes, that's generally not how these

18   work.

19     A.    Okay.  Got you.

20     Q.    But I know you're not an attorney --

21     A.    Right.

22     Q.    -- and have not been deposed very

23   many times before, so I understand, and I

24   apologize for any --

GERARD R. MADDREY

Page 70

1    A.    That's fine.

2    Q.    -- confusion.

3          So I think consistent with what
4    you've said earlier, as to Number 1, you
5    don't have any documents that relate to the
6    relationship between --

7    A.    Yes.

8    Q.    -- the broker on the one hand and the
9    Plaintiffs in this case?  That's just not
10   something you ever had?

11   A.    No, I don't have access or privilege
12   to that information.

13   Q.    And when you write "Elite REO" on
14   this document, that as we talked about
15   earlier is the same entity that's also
16   referred to interchangeably with Elite
17   Premier Properties, correct?

18   A.    Correct.

19   Q.    And consistent with what you said
20   earlier, you don't have any documents in
21   Number 2 that relate to the relationships
22   between Elite Premier Properties and any of
23   the banks or lenders involved?

24   A.    No.

GERARD R. MADDREY

Page 71

1    Q.    And I think you mentioned earlier you

2  don't have any appraisal documents.  For one

3  reason, you are not now an appraiser and

4  never have been an appraiser, correct?

5    A.    Correct.  And these aren't appraisals

6  either.

7    Q.    Right.  And related to that, you

8  don't retain copies of an REO (sic) upon your

9  submitting it to whichever --

10    A.    Correct.

11    Q.    -- vendor or broker you're working

12  with?

13    A.    That's not my -- it doesn't belong to

14  me.

15    Q.    And your answers, as I think you

16  mentioned earlier, you had no communications

17  with Clear Capital or anyone else with

18  respect to this litigation because you didn't

19  even know about this litigation until you got

20  the Subpoena, correct?

21    A.    Correct.  Right.

22    Q.    Number 7 asks for communications

23  relating to requests made by you by anyone to

24  modify the appraisal value/report for the

GERARD R. MADDREY

Page 72

1    property located at 1233 Meadowbank Road,

2    Villanova, correct?

3     A.    Okay.

4     Q.    And your response to that that you

5    wrote on Maddrey-2 is, "I do not have any

6    communication relating to modifications of

7    the value reports for the property".

8     A.    Correct.

9     Q.    Do you recall there being any

10   communications either in writing or orally to

11   you from anyone to modify a BPO that you

12   completed with respect to 1233 Meadowbank

13   Road?

14    A.    No.

15    Q.    Do you know as you sit here today

16   whether any such request was ever made of

17   you?

18    A.    No.

19    Q.    Do you recall modifying in any way

20   the BPO for 1233 Meadowbank Road after

21   initially submitting it?

22    A.    No.

23    Q.    In the course of conducting BPOs, do

24   you sometimes modify the BPO after you

GERARD R. MADDREY

Page 73

1    initially submit it to a vendor?

2      A.    All the time, yes.

3      Q.    How frequent of an occurrence would

4    you say that is?

5      A.    It depends.  You know, again, I do

6    modifications for -- I mean I do BPOs for all

7    types of vendors, but there's always

8    modification requests I mean on reports.  It

9    could be -- it just depends.

10     Q.    Is that more typical than not,

11   meaning do more than half of them get

12   modified in some way after you initially

13   submit them?

14     A.    You know, one of the ways you get

15   judged by some of the vendors is the

16   percentage of clarifications you get, so you

17   want to try to keep them down as a person

18   doing BPOs for these vendors.  However, maybe

19   40 percent come back for some type of

20   clarification.

21     Q.    About 40 percent, would that be

22   accurate just within the residential realm?

23     A.    Yes.  Yes, I would say.  I mean all

24   in all they -- it's alwa- -- it just could be

GERARD R. MADDREY

Page 74

1    anything.  You never know what the -- yes,

2    they come back for corrections.  Some

3    mistakes are made, and sometimes things are

4    missing.  It just depends.  Or some -- you

5    know, it just depends on the report.

6      Q.    So, trying to understand the

7    mechanics of how that might work, you receive

8    this electronic solicitation to do a job for

9    an REO --

10     A.    Correct.

11     Q.    -- or BPO?

12           You go conduct it.  You

13    electronically submit the BPO.  How would a

14    request for a modification come to you?

15     A.    The same way we're solicited.

16    Electronic request, electronically e-mail or

17    text will come through you have a clar- --

18    again, it depends on the vendor, but in most

19    cases, the same way you're solicited.

20     Q.    So it can be e-mail or text?

21     A.    Yes, probably both to let you know

22    you got something that needs your attention.

23     Q.    And does that request come from --

24    well, who does that request come from?

GERARD R. MADDREY

Page 75

1    A.    The vendor.

2    Q.    Do you ever get a request for a

3    modification from another party, say a

4    homeowner, a lender or anybody else other

5    than the vendor who did the initial

6    solicitation?

7    A.    No.  So here's how it works:  The

8    report is submitted to the vendor.  I submit

9    the report in.  And let's say the vendor

10   approves it.  Then it goes to whoever

11   initially ordered the report.

12        So I'd say 5 to 10 percent of the

13   time sometimes it's kicked back from whoever

14   ordered the report saying, "Hey, they want us

15   to reconsider or look at something".  Maybe

16   they saw things differently or they disputed

17   the report.  So sometimes it gets kicked back

18   once the homeowner looks at it or whoever the

19   end party is.

20        You know, and it could be anything.

21   It could be, "Oh, you know what, you guys

22   reported the square footage wrong".  It could

23   be anything.  It doesn't -- but sometimes it

24   does come back.  But that goes to the vendor

GERARD R. MADDREY

Page 76

1    and then the vendor comes to me and say,

2    "Hey, we had -- you know, they reviewed the

3    report, and here's the concerns".

4       Q.    Have you ever in your career had

5    direct communication with who you referred to

6    as like an end-user, either who is getting

7    the report done, the homeowner, the bank,

8    whoever, did they ever directly come to you

9    and say "need you to reconsider this"?

10      A.    Oh, I can't, yes.  No, I don't

11   have -- I don't even -- no, I don't have

12   access to the report.  I submit the report to

13   the vendor.  That request has to go to --

14   whoever ordered the report would have to get

15   in touch with the vendor for it to get back

16   to me.

17      Q.    And so the request would come from a

18   vendor?

19      A.    I can't take a modification request

20   for whoever ordered the report.

21      Q.    Has that ever happened and then you

22   have to go to the vendor and say, "I got a

23   request for a modification and I" --

24      A.    No.  That's never happened, yes.

GERARD R. MADDREY

Page 77

1    Q.    Never in your career?  That's just

2  not something that happens?

3    A.    No.  I never -- I can't go to them.

4  It just couldn't happen.  I mean that's not

5  how it works, no.

6    Q.    I'm just continuing down your list of

7  responses.  I'm trying not to necessarily go

8  over every one.

9    A.    Yes, I'm sorry, I don't have much

10  information on -- but I really would like to

11  see the report to see what this is all about

12  to be quite honest.

13    Q.    You've never had any communications

14  with Ocwen or Bank of America.  Is that

15  right?

16    A.    Nothing, yes.

17    Q.    I see Number 13 asked documents

18  regarding the number of jobs or referrals you

19  received from Caliber from 2010 to the

20  present and the percentage of your business

21  these comprised, and your response was, "I do

22  not have any information regarding job

23  referrals or percentage of business from

24  Caliber".  Is that right?

GERARD R. MADDREY

Page 78

1    A.    Correct.  I mean that's probably

2    something to ask the vendor, not me.

3    Q.    So do you know when you get a

4    solicitation from a vendor that it's

5    originat-, who is originating the request

6    that it be done?

7    A.    No, I'm not privileged to that

8    information, and in most cases, I don't know

9    why I'm even doing the actual report.

10    Q.    Do you have access to that

11    information if you, at any point in the

12    process of doing a BPO, if you wanted to find

13    that out?

14    A.    No.  I don't even try to.  I mean no.

15    Q.    I'm just trying to understand.  You

16    don't know that it's originating from a bank

17    or a homeowner or which bank.  Is that right?

18    A.    I have no idea who is behind ordering

19    the report, right.

20    Q.    So that's why you're telling me you

21    can't possibly figure out what percentage of

22    your work came from Caliber because you

23    really don't know?

24    A.    I have no idea.  I have no idea,

GERARD R. MADDREY

Page 79

1   right.

2       Q.    Are you familiar with the company

3   Caliber?  Do you know them?

4       A.    I've heard of Caliber, yes.  I mean,

5   in real estate, I've heard of them, but yes.

6       Q.    And do you know if Caliber has any

7   control over the appraiser selection, the

8   appraisers that they use?

9       A.    No.  Like I said, when I get

10  solicited for a job, I'm not the only one

11  being solicited.  Anyone can go in and accept

12  that order before somebody else accepts that

13  order.  So that's kind of how it works.  So

14  you never know who is going to get what, you

15  know.  So, no, I don't think they have any.

16      Q.    And in the course of doing BPOs, like

17  Clear Capital the vendor that you get

18  solicited from, do they ever provide you with

19  guidelines or procedures that emanate from

20  one of the banks or people that they work for

21  saying like "here's the requirements when

22  it's a Bank of America job" or "here's the

23  requirements" --

24      A.    No.

GERARD R. MADDREY

Page 80

1    Q.     -- "for a Wells Fargo job" or

2    whatever it might be?

3    A.    No.  It's instructions in the order,

4    but most of them are pretty similar.  I'm

5    just finding average just report, you know,

6    compared to average properties in the area.

7         Yes, the instructions are in the

8    report, but no, there's no specific

9    instructions for -- again, I don't even know

10   who is behind it.  None of these --

11   Q.    I was going to say the instructions

12   don't contain who the --

13   A.    None of these banks or people you're

14   talking about are ever even listed.  We're

15   not privileged to that.

16   Q.    Number 22 asked about whether Elite

17   Premier Properties, whether you had

18   possession of any things that relate to their

19   document retention, document destruction type

20   policies or procedures, and you said you do

21   not.

22        Did they, when you were affiliated

23   with them, did they provide you with anything

24   like that and said, "Our company requires the

GERARD R. MADDREY

Page 81

1   people who are contracting with us or working

2   for us to abide by these things.  We need you

3   to save this or save that"?

4     A.    No.  No, nothing.  No.

5     Q.    I guess because you submit it

6   electronically they have it, and they --

7     A.    Yes.  Elite is kind of, I mean

8   they're -- the vendor controls everything.

9   Elite, myself, we don't -- I don't think we

10  have anything to do with it, yes.

11    Q.    Let's turn to the next page you

12  brought with you.

13    A.    That I brought with me?

14    Q.    Yes.

15    A.    Okay.

16            MR. HULING:  We'll label that

17        Maddrey-3.

18                  -   -   -

19    (Maddrey-3 marked for identification.)

20                  -   -   -

21  BY MR. HULING:

22    Q.    What is that document?

23    A.    It's just my real estate license.

24  Just wanted to show you I'm not a licensed

GERARD R. MADDREY

Page 82

1    appraisal.  I'm just a licensed real estate

2    agent.

3           And these are not appraisals.

4    They're just quick broker price opinion

5    summaries.  They pay 40 to 70 bucks.  I mean

6    this is not an appraisal.  I just wanted to

7    show.  Because you keep referencing

8    appraisal, I'm like, you know, maybe they

9    don't understand what this actually is.

10    Q.    Sure.  So I see that on here it lists

11    that you've never had any disciplinary

12    action?

13    A.    No.

14    Q.    That's correct?

15           And do you, in the course of

16    performing real estate services, do you ever

17    have need of an appraiser for a property that

18    you're involved with and you retain an

19    appraiser?

20    A.    I just refer- -- you know, I don't

21    even want to say referred one but I have a

22    potential person I'm going to be representing

23    to sell an estate in University City, and

24    he's going through a process with his aunt's

GERARD R. MADDREY

Page 83

1    reverse mortgage company and he needed an

2    official appraisal done on the property.

3         So I didn't refer anyone.  I just

4    looked online and found a company.  I gave

5    him three names to call.  Because he didn't

6    seem like he could do that himself.  I'm

7    like, "All you got to do is look".

8         So I gave -- actually, he called me

9    back and said, "I got one of them to come

10   out".  I think they came out yesterday.  So,

11   yes, I mean, yes, I just referred someone to

12   get an official like, you know, appraisal

13   done on his estate.

14   Q.   You said you provided three potential

15   names.  Like are those all appraisers that

16   you have personal experience with?

17   A.   I don't.  Like I said, I was very

18   busy, and he was -- he seemed like he didn't

19   -- he wanted me to refer someone.  I don't

20   really have a go-to appraiser.  So I just

21   looked online and found three quick ones

22   online and said, "Hey, try these guys", and

23   one of them responded faster than others and

24   he hired them.  He got it done yesterday.  I

GERARD R. MADDREY

Page 84

1   talked to him on the way over here.

2      Q.    Do you have any knowledge about

3   whether an actual appraisal, not a BPO, was

4   ever conducted at any time with regard to

5   1233 Meadowbank Road?

6      A.    No.

7      Q.    Let's turn to the next page you

8   brought with you.

9                MR. HULING:  We'll label it

10         Maddrey-4.

11                   -   -   -

12      (Maddrey-4 marked for identification.)

13                   -   -   -

14   BY MR. HULING:

15      Q.    This looks like a printout.  It looks

16   like -- you tell me what this is.

17      A.    I just wanted you to see that this is

18   just a very quick, you know, estimate of

19   value that's merely an opinion of a licensed

20   real estate agent.  This is not an appraisal.

21   I just wanted you to see the difference

22   between a BPO and appraisal, which is used in

23   your solicitation to me.

24                So it's just a definition, and you

Page 85

1    know, it's just a quick summary of value.   If

2    I came to, if you wanted to list your house

3    for sale, I'd come meet with you at your

4    house and I'd have a couple comps with me.

5    That's all this is.   It's not an appraisal.

6        Q.    This document indicates, "BPOs are

7    quite similar to appraisals but are shorter,

8    quicker value estimates that are not done by

9    licensed appraisers".

10       A.    Correct, we're not a licensed

11   appraiser.   So a licensed appraiser might --

12   you know, it just might be altogether

13   different.   These are just our opinions, and

14   we're licensed real estate agents.   This is

15   just -- it's not anywhere on the same level

16   as an appraisal.

17       Q.    Maddrey-4 also indicates that, "BPOs

18   are used heavily by banks during the short

19   sale, foreclosure, loan modification and

20   refinancing processes".   Is that true in your

21   experience?

22       A.    I guess.   They don't really privilege

23   us the information on why a particular BPO is

24   being conducted.   We just come up with a

GERARD R. MADDREY

Page 86

1    quick value estimate for them.

2      Q.    And it says --

3      A.    And they're quick.  I don't spend any

4    more than a half an hour on these.  It's

5    quick.

6      Q.    And if I recall correctly, if it's a

7    drive-by, it can be even much shorter than

8    that?

9      A.    Well, that's what I mean.  I mean

10   total time you got to enter data in the

11   system.  It's really -- locate comps.  You

12   put a --

13     Q.    Oh, I see.

14     A.    Right.

15     Q.    You were saying like even with the

16   time taken into consideration of entering it

17   into the computer system to submit it's still

18   maybe a half-hour process?

19     A.    Half hour, yes.

20     Q.    So it's not --

21     A.    The furthest thing is driving to the

22   property usually.

23     Q.    You're right.  It's not very

24   time-intensive other than perhaps traffic?

GERARD R. MADDREY

Page 87

1    A.    No, or they would be paying more than

2    40 bucks for it.

3    Q.    So it certainly is consistent with

4    your experience then, as Maddrey-4 says,

5    "Banks use them because they are cheaper and

6    faster than a formal appraisal"?

7    A.    Correct.  I guess it gives them a

8    quick snapshot of it, and you know, maybe

9    they'll order one in the future but I'm not a

10   part of that.

11   Q.    I see you printed this out from a

12   website called findwell.com.

13   A.    There's a million definitions online.

14   You can Google it.  I just wanted you to have

15   something to show that this is not an

16   appraisal.

17   Q.    That's how you found this site was

18   Googling, I take it?

19   A.    Google, yes.  I just wanted to give

20   you a formal definition of a BPO.

21   Q.    The next 11 pages is the same

22   document in your --

23   A.    Correct.

24             MR. HULING:  And we'll label

GERARD R. MADDREY

Page 88

1        that Maddrey-5.

2                    -  -  -

3      (Maddrey-5 marked for identification.)

4                    -  -  -

5   BY MR. HULING:

6     Q.    And what is that document,

7   Mr. Maddrey?

8     A.    Just the Code of Ethics from

9   Pennsylvania.  Just the Code of Ethics and

10  Standards of Practice regards to realtors in

11  PA.  It was just my best document I could

12  pull to answer Number 16.  Maybe it's not

13  that applicable.

14          You know, I was just showing, you

15  know, here's the Code of Ethics we abide by

16  in the State of PA.  I don't know if it's

17  actually the appropriate document, but I just

18  felt I needed to have something for that.

19    Q.    And this governs your professional

20  practice because you're a licensed real

21  estate agent?

22    A.    Correct.

23    Q.    And I see this document says it's

24  effective January 1, 2016.

GERARD R. MADDREY

Page 89

1    A.    It's old.  But I'm pretty sure it

2    still is pretty similar.

3    Q.    That's what I was going to ask.  Is

4    there a new one of these every year or does

5    that one stay in effect for a number of

6    years?

7    A.    It probably stays in effect, but I

8    could, you know, --

9    Q.    To the best of your knowledge, is

10   this one still in effect?

11   A.    To the best of my knowledge, yes.

12   Q.    Is there any portion -- are you

13   familiar with this document?

14   A.    I am, yes.

15   Q.    Is there any portion of this document

16   that has specific applicability to creating

17   or submitting BPOs?

18   A.    You know, again, BPOs, it's part of

19   the work that we do so I would, you know, --

20   and we are compensated for.  So it's ethics

21   involved and, you know, definitely standards

22   and things.  So, yes, I would say it's

23   applicable to BPOs.

24   Q.    I presume and confirm by what you're

GERARD R. MADDREY

Page 90

1    saying that certainly when performing a BPO

2    you are governed by this, but I might have

3    been unclear.   My question I was trying to

4    get at was:

5              Is there any particular section that

6    specifically speaks about a real estate

7    agent's ethical obligations when conducting a

8    BPO or anything in here?

9      A.    I don't think it specifically

10   mentions BPOs in that document.

11     Q.    I see on the third page of this

12   there's a Standard of Practice 1-14 that

13   says, "Fees for preparing appraisals or other

14   valuations shall not be contingent upon the

15   amount of the appraisal or valuation".   Do

16   you see that?

17     A.    Okay.

18     Q.    It looks like that was adopted

19   January of 2002.   Do you see that?

20     A.    Okay.

21     Q.    And that's consistent with what

22   you've told me that you generate a flat fee

23   for these things.   The compensation you

24   receive for doing a BPO is never contingent

GERARD R. MADDREY

Page 91

1    upon how much the value is.  Is that correct?

2      A.    Correct, absolutely.

3      Q.    You've never had a situation where

4    the amount of the appraisal could affect the

5    amount of the compensation you're receiving?

6      A.    No.

7      Q.    At any time in your whole career?

8      A.    No.

9      Q.    That's just not how it works?

10     A.    The fees on the -- yes, the fees are

11   set when you get an order.  If I got an order

12   right now, the fee would be "here's what

13   we're paying for this, do you want to accept

14   it or not" pretty much, yes.

15         It has nothing to do with the value.

16   The value could be -- I've done commercial

17   appraisals downtown recently.  The value was

18   $30 million or something.  You know, it has

19   nothing to do with the value of the subject

20   property.

21     Q.    Let's move onto the next.  Are the

22   last two pages the same document or are they

23   slightly different?

24     A.    I think you might have just printed

GERARD R. MADDREY

Page 92

1    out two.  I only have one in mine.  It's just

2    a copy of my resume.

3                    MR. HULING:  Off the record.

4                         -  -  -

5       (A discussion off the record occurred.)

6                         -  -  -

7                    MR. HULING:  Let's mark this as

8          Maddrey-6.

9                         -  -  -

10      (Maddrey-6 marked for identification.)

11                        -  -  -

12   BY MR. HULING:

13      Q.    It's a two-page document, I guess,

14   but they're both -- except it looks like for

15   some handwriting at the top or doodling,

16   they're identical.  Is that correct?

17      A.    Yes.

18      Q.    It was your resume?

19      A.    Yes.  It was just -- because you

20   asked for something in regards to

21   professional experience.  I figured that was

22   just easiest.

23      Q.    And this sets forth --

24      A.    And we talked about that.

GERARD R. MADDREY

Page 93

1    Q.    Right.

2          -- what you've been doing since 2006

3    to the present professionally?

4    A.    Correct.

5    Q.    And your educational background that

6    we also talked about?

7    A.    Right.

8    Q.    Did you create this for coming here

9    today?

10   A.    No.  I already had one on the

11   computer.

12   Q.    Anything on here that's not accurate

13   or up-to-date as of today?

14   A.    No.  No.  You asked me some questions

15   that went further back than the resume with

16   experience, but it's accurate.

17   Q.    Do you have a recollection of -- I

18   might have already asked this before.

19   Forgive me if I did.  Do you have a

20   recollection of what value you determined as

21   part of doing the BPO at --

22   A.    I have no clue.

23   Q.    -- 1233 Meadowbank Road in Villanova?

24   A.    I have no clue without seeing the

Page 94

1    report.

2      Q.    I'm going to show you what we'll mark

3    as Maddrey-7, which is an e-mail string.

4    It's three pages, although I'm initially

5    going to ask you about the e-mail that begins

6    on the second page.  Because as e-mail

7    strings are, that came first chronologically,

8    but you're free to take a look over the

9    document before I start asking you anything.

10   Just let me know when you're ready to

11   proceed.

12                    -  -  -

13     (Maddrey-7 marked for identification.)

14                    -  -  -

15   BY MR. HULING:

16     Q.    Are you ready?

17     A.    Yes.

18     Q.    So this e-mail that begins on the

19   second page of Maddrey-7 was sent on May 15,

20   2017.  Is that correct?

21     A.    Yes.

22     Q.    And it came from Clear Capital Vendor

23   Support?

24     A.    Correct.

GERARD R. MADDREY

Page 95

1    Q.    And it's addressed to you

2    gerard.maddrey@elitereo.com?

3    A.    Correct.

4    Q.    What's gc@elitereo.com?

5    A.    Not sure.  "qc" maybe?  Quality

6    control maybe.

7    Q.    Do you know whose e-mail address that

8    is, the second e-mail?

9    A.    I don't, yes.

10   Q.    So it says, "Hello Gerard, please

11   don't reply to this automatically generated

12   e-mail.  We find that clicking the link below

13   results in fewer clarification requests and

14   faster overall processing time for all

15   involved parties".  You see that, right?

16   A.    Yes.

17   Q.    So is this e-mail representative of

18   what we talked about earlier of a time when

19   you've completed a BPO, submitted it through

20   Clear Capital's vendor website, and you're

21   now receiving a request for a modification?

22   Is that correct?

23   A.    It's a clarification request,

24   correct.

GERARD R. MADDREY

Page 96

1    Q.    Yes, I see they're using the term

2    "clarification".  Is it fair to say that's

3    the same as what we were talking about

4    earlier and you were testifying about being a

5    modification request?

6    A.    Correct.

7    Q.    And it says, "This clarification is

8    regarding the property at 1233 Meadowbank

9    Road in Villanova", and then it has a

10   parenthetical that says "(Property ID)" with

11   a number.  Do you see that?

12   A.    Correct.

13   Q.    Is that Property ID number, does that

14   just identify the job for that address?

15   A.    That probably identifies the -- yes,

16   that's the ID of the property.  That's the

17   report number.

18   Q.    And it says, "Please note, your

19   completed clarification request is due at

20   1:44 p.m. Pacific Time on" -- it looks like

21   5/15/2017.  Did I read that correctly?

22   A.    Correct.

23   Q.    So they're giving you what seems like

24   an hour or so if they sent this on Pacific

GERARD R. MADDREY

Page 97

1   Time that said 12:44 and they want it by

2   1:44?

3    A.    Correct.

4    Q.    Am I reading that correct?

5          Is that typical for a clarification

6   request that you have just an hour or so to

7   respond?

8    A.    It doesn't mean I'm going to get to

9   it in an hour, but you know, it's just

10  typical.

11   Q.    They want it within an hour?

12   A.    I guess.

13   Q.    What would happen if you don't comply

14  with a deadline for a clarification request?

15   A.    Just communicate with them and let

16  them know it will be a little longer.  I

17  could be out on the road or anything.  It

18  just depends.

19   Q.    Would it ever get reassigned to

20  somebody else?  Like the solicitations for

21  doing a BPO, if you don't respond by the

22  deadline, somebody else has to do that?

23   A.    I'm not sure.  I never had that

24  happen.  So I'm not sure what happens, but --

GERARD R. MADDREY

Page 98

1    Q.    When you receive a clarification

2    request from the vendor and Clear Capital

3    like this, is there any additional

4    compensation involved in responding to that

5    versus having done the BPO originally?

6    A.    No.  It's part of the process.  It's

7    part of -- no, no additional compensation.

8    Q.    When do you get compensated for

9    providing it?  Would you get that

10   compensation merely upon submitting the

11   initial BPO?

12   A.    Whatever you complete within a

13   two-week period -- this particular vendor

14   releases it like every two weeks.  So

15   whatever volume you have that closed or --

16   Q.    If you did ten of them within the

17   two-week period, for example, --

18   A.    You would get that every two weeks.

19   Q.    -- and every one was $50, you'd get a

20   $500 --

21   A.    Correct.

22   Q.    Are they considered completed -- like

23   when is the BPO considered completed I guess

24   is my question?  Is it upon you submitting

GERARD R. MADDREY

Page 99

1   the initial report?  Is it wait for any

2   clarification requests to come in and they

3   are dealt with?

4      A.    No.  After -- if it's a

5   clarification, after the clarification and --

6   that's it.  I mean, if the clarification,

7   once you, you know, -- yes, it's -- no, if

8   it's a clarification, the clarification has

9   to be satisfied, you know, and then it's

10   approved.  You'll get an e-mail saying it's

11   been approved.

12      Q.    Do you sometimes get multiple

13   clarification or modification requests for a

14   single BPO?

15      A.    You do.

16      Q.    Is it typical to get three or four or

17   five requests?

18      A.    It depends.  It depends on the order

19   and if, you know, if it's -- you know, it

20   just depends.

21      Q.    What's the most you've ever seen for

22   a BPO you've done?

23      A.    It can go back and forth ten times if

24   it's not -- you know, if something --

GERARD R. MADDREY

Page 100

1    sometimes some things are not clear.  So it's

2    not necessarily anyone did anything wrong or

3    anything.  It could be we're not clear or

4    they didn't provide enough information on a

5    particular -- so it just depends, you know.

6          Commercial I've seen go back and

7    forth a lot, you know.  Residential, same

8    thing, it just depends on the property.

9    Q.    Do you know, recollect or can figure

10   out from this document when you submitted the

11   initial BPO report such that you were getting

12   this request for clarification on May 15th?

13   A.    I don't know that answer.

14   Q.    Is there a certain amount of time

15   that Clear Capital has to request a

16   clarification?

17   A.    No.  I mean they review it after you

18   submit it, and it's approved or you get a

19   clarification.

20   Q.    In your experience, does that happen

21   within a day or two of you submitting a

22   report?  Within a week?  Within a month?  I'm

23   just trying to understand the timeline.

24   A.    Oh, a clarifica- --

GERARD R. MADDREY

Page 101

1    Q.    Yes.

2    A.    A clarification?  A day or two maybe.

3    Yes, I would say within 24 to 48 hours

4    definitely.

5    Q.    Have you ever had the experience

6    where the clarification request would come in

7    weeks later?

8    A.    Only if it was reviewed by the end,

9    someone on the other side and they looked it

10   over and they said "hey, we want you to

11   consider this" or "maybe you missed out,

12   there's an extra garage in the back you

13   didn't consider", you know, "you got the

14   square feet wrong", and they'll send proof of

15   it and we'll review it.  You know, it just

16   depends.  But the only -- yes, not that far

17   out.  Only if it's kicked back from the end,

18   whoever ordered it on the end.

19   Q.    But in the typical residential BPO,

20   it's usually a day or two.  Is that fair to

21   say from what you testified about?

22   A.    Correct, yes.

23   Q.    Just so we're clear, from between

24   when you submit the BPO report electronically

GERARD R. MADDREY

Page 102

1   to when you'd receive a clarification

2   request, --

3     A.    Correct.

4     Q.    -- that's the time period we're

5   talking about?

6     A.    Correct.

7     Q.    So, under where it describes the

8   clarification request in this e-mail, it

9   says, Number 1, "This customer requires comps

10  to have sold within the last 12 months", and

11  then there's a parenthetical that says

12  "(C.R. ID 500012)".

13    A.    Okay.

14    Q.    Do you see that?

15    A.    Got you.

16    Q.    So is it fair to say that means the

17  BPO you submitted initially used comps that

18  were older than 12-months old?

19    A.    I would assume so.

20    Q.    Do you have any recollection of that

21  with respect to this job?

22    A.    No.  I'm just reading what's on here.

23    Q.    And do you have any recollection of

24  who the customer is that they're referencing

ELITE LITIGATION SOLUTIONS, LLC

GERARD R. MADDREY

Page 103

1   in this e-mail?

2    A.    No.

3    Q.    Did you know at the time?

4    A.    Who the customer?  Like the bank?

5    Q.    Yes.

6    A.    No.  No.  No.

7    Q.    What does the parenthetical "(C.R.

8   ID #500012)" mean?

9    A.    I have no idea.

10   Q.    That's something internal to Clear

11  Capital perhaps?

12   A.    I guess.

13   Q.    It didn't mean anything to you then

14  or now?

15   A.    No.

16   Q.    Number 2 says, "It appears the price

17  conclusion is a near average of the wide sold

18  comp price range.  The price should fall in

19  line with the most supporting sold comp,

20  within reason", and then there's another

21  parenthetical with a code.

22   A.    Okay.

23   Q.    What did Number 2 mean to you in the

24  context of getting a clarification?

GERARD R. MADDREY

Page 104

1    A.    I'm not sure.  "It appears the price

2    conclusion is a near average of the wide

3    sold" -- well, just as it says.  If it's a

4    really similar comp, let's say the house is

5    5,000 square feet and -- you know, it's hard

6    to say.

7          Again, not really -- it's actually

8    hard to say exactly what they meant by that

9    without having the whole entire picture in

10   front of me, but I mean it -- you know, I,

11   again, I would have to see the whole report

12   to understand exactly what they're talking

13   about.

14   Q.    What does the phrase "wide sold comp

15   price range" mean to you?

16   A.    Don't know.  I don't know what

17   they're referencing right there particularly.

18   Q.    How would you have addressed this if

19   --

20   A.    If it's a wide sold comp price range,

21   I mean it -- you know, I don't know.  That

22   maybe comps are all over the place in the

23   particular area, you know.  I'm not sure.

24   Q.    When you receive a clarification

GERARD R. MADDREY

Page 105

1  request that uses a term or asks for

2  something that you're not sure of, is there

3  somebody you respond to to --

4      A.    I call in, yes.

5      Q.    And is there a particular point of

6  contact that you have at Clear Capital to

7  deal with that or you just call a customer

8  service number?

9      A.    They got people pick up the phones,

10 yes.

11     Q.    So you talk to different people all

12 the time.  It's not like you have a personal

13 relationship, is that fair to say, --

14     A.    Right.

15     Q.    -- with one particular person?

16     A.    Yes.

17     Q.    Do you recall whether you called to

18 ask for some clarification about their

19 clarification request in this job?

20     A.    I don't recall.

21     Q.    As you sit here today, do you think

22 you would have if there was a term in here

23 that you didn't understand what they were

24 asking for or what it meant?

GERARD R. MADDREY

Page 106

1    A.    I would call in if it was something I

2    didn't understand, definitely.

3    Q.    But you just don't remember whether

4    you --

5    A.    No.

6    Q.    -- actually did in this case?

7    A.    No.

8    Q.    Now, the Number 3 thing they have

9    under the clarification request is, "Please

10   review these additional sales.  If they are

11   good indicators of value, please include them

12   in your report.  If they are not, provide a

13   detailed explanation on each as to why they

14   are not a good indicator of value (regardless

15   of sale date)", and then they're calling your

16   attention to one specific property it looks

17   like that was sold the prior November.  Is

18   that right?

19   A.    Okay.  Okay.

20   Q.    Is it fair to say they're saying when

21   you're re-reviewing your submission take this

22   comp into consideration rather than one or

23   more of the ones you used?

24   A.    They're -- let me see.  Yes, I would,

GERARD R. MADDREY

Page 107

1    again, I'd need to see the report to see

2    exactly what -- I'm not sure if that was in

3    my report.  It depends.

4              Sometimes, you know, you get people

5    that's reviewing and I'll -- sometimes you

6    get people reviewing these reports that don't

7    send over -- they send over things that are

8    not for clarifications that might be very

9    similar to what's already -- it just depends

10   who you have reviewing it, and not all

11   reviewers are the same.

12             So, yes, I would need to see the

13   actual report to know exactly what they are

14   referencing here.

15   Q.    Do you remember ever looking at this

16   1216 Valley Road property?

17   A.    I don't.  And as I said, I would need

18   to really see the report to really see what

19   they're talking about.

20   Q.    Has looking at this document and just

21   testifying today generally and looking at the

22   other documents refreshed your recollection

23   at all about whether or not you did do a

24   revised BPO with respect to the 1233

GERARD R. MADDREY

Page 108

1    Meadowbank Road property in connection with a

2    clarification request?

3      A.    I'm not sure whether it was -- it

4    depends.  You know, sometimes you call in,

5    you talk back and forth, and you justify what

6    you've got.

7            I'm not really sure what happened

8    here, and it's been a while since I looked at

9    anything on the residential side.  So some of

10   this stuff is -- I don't know exactly what

11   they're talking about without seeing the

12   actual report.

13     Q.    Besides that one phrase we talked

14   about earlier, what else on here do you not

15   exactly know what they're talking about

16   within this e-mail?

17     A.    Well, again, I need to see the

18   actual -- if I can see the actual report,

19   then I can probably understand what they're

20   talking about or what they're asking me, but

21   without seeing that, I don't understand just

22   by reading this here.

23     Q.    Do you know whether or not you

24   ultimately did accept this 1216 Valley Road

GERARD R. MADDREY

Page 109

1    property as an appropriate comp or not an

2    appropriate comp for the BPO at 1233

3    Meadowbank Road?

4      A.    I'm not sure.  I'm not sure if it

5    wasn't in the original report either.

6    Sometimes they're duplicates.

7            And like I said, some reviewers send

8    back clarifications no matter -- I mean,

9    believe it or not, no matter what, you'll get

10   it back, and sometimes you have to call in

11   and talk to them and say "hey".  They say,

12   "Hey, you're missing an address", and I say,

13   "Well, no, the address picture is there".

14           It just depends on the reviewer.  I

15   don't know how many people they got

16   reviewing, but for residential, it's probably

17   a lot.

18     Q.    Now, on the tail end of this e-mail

19   that goes onto the next page, it says, "Once

20   you have responded please re-submit the CMA

21   by selecting the 'Submit' button".  Do you

22   see that?  It's at the top line of the --

23     A.    Okay.  Yes.

24     Q.    What's "CMA" an acronym for?

GERARD R. MADDREY

Page 110

1    A.    I would think comparative market

2    analysis.

3    Q.    Is that synonymous with BPO or is

4    that different?

5    A.    I think I use the word "CMA" and I

6    likened it to me coming to your house listing

7    your property and I would come out with

8    comparables for you in your neighborhood.

9    That's a CMA that a, that's what a realtor

10   prepares for like a homeowner like you.

11         So I guess maybe I didn't use the

12   term CMA, but that's exactly what that is.

13   So, yes, I didn't -- I think it means

14   comparative market analysis.  That's a CMA.

15   Q.    Is that different from a BPO?  I

16   don't know.

17   A.    It's on the same level.  Like I said,

18   I likened them the same in my example, and

19   that falls right in line.

20   Q.    To you, there's not --

21   A.    No.

22   Q.    If you were asked to do a CMA versus

23   do a BPO, that's the same thing?

24   A.    Correct.

GERARD R. MADDREY

Page 111

1    Q.    Whereas if you were asked to do an

2    appraisal, you'd say, "I don't do

3    appraisals"?

4    A.    Right.

5    Q.    So, having received that on May 15,

6    2017, if you go back to the first page of the

7    string, there's an e-mail from you to Scott

8    Korn on May 19, 2017.  Do you see that

9    e-mail?

10   A.    Okay.

11   Q.    Yes, you see that on the first page?

12   A.    I'm looking at it.

13   Q.    So, four days after you get the

14   request for the clarification, you send this

15   e-mail to Scott Korn.  Is that correct?

16   A.    Okay.

17   Q.    Do you recall doing that?

18   A.    No.

19   Q.    Do you have any reason to think

20   looking at this document now that you didn't

21   send this e-mail on or about May 19th at

22   8:58 a.m.?

23   A.    I don't remember it.  That's for

24   sure.

GERARD R. MADDREY

Page 112

1    Q.    Now, you wrote, "I don't have the

2  actual report showing the 1,19 but the e-mail

3  below is what they sent me to change it to

4  the current".  Do you see that first

5  sentence?

6    A.    I'm reading it, yes.

7    Q.    And then, "Please do not share this

8  e-mail with anyone".  That's the next

9  sentence.  Do you see that?

10   A.    Okay.

11   Q.    And then the third sentence says,

12 "This is for your information only".  Do you

13 see that?

14   A.    Yes.

15   Q.    Then it says, "I could lose my

16 license.  Thanks".

17   A.    Okay.

18   Q.    I read everything there correctly?

19   A.    Correct.

20   Q.    Do you recall sending this e-mail to

21 Scott Korn?

22   A.    I do not.

23   Q.    Does this refresh your recollection

24 at all about whether you had contact with

GERARD R. MADDREY

Page 113

1    Scott Korn back in May of 2017 about the 1233

2    Meadowbank Road property?

3      A.    I don't -- it doesn't -- yes, I don't

4    remember him or this.

5      Q.    But in the Subject line of the

6    e-mail, it does reference 1233 Meadowbank

7    Road, correct?

8      A.    It does.

9      Q.    And it's forwarding the clarification

10   request for that property that we looked at

11   previously, correct?

12     A.    Okay.

13     Q.    Is that right?

14     A.    Okay, yes.

15     Q.    The reference to not having "the

16   actual report showing the 1,19", does that

17   mean to you that the BPO or CMA that you

18   submitted for 1233 Meadowbank Road initially

19   was $1,190,000?  Is that what that means to

20   you?

21     A.    No.  I don't know what that means.

22   Like I said, I don't even know what I'm

23   talking about here.

24            No, I'm not sure what that means.  To

GERARD R. MADDREY

Page 114

1   be quite honest, I don't even know what we're

2   talking about here.

3      Q.    Do you recall that Scott Korn is one

4   of the owners of 1233 Meadowbank Road,

5   Villanova, PA?

6      A.    Well, I know now, yes, but -- yes,

7   I'm not sure what "1,19" references.

8      Q.    Do you have any reasonable

9   presumption as to what that would refer to?

10     A.    I'm thinking what we're talking

11  about.  I don't know.  I don't --

12     Q.    Do you remember why you told --

13     A.    Like I said, I would need to see -- I

14  don't know what we're really talking about

15  here.  Go ahead.

16     Q.    You're the talker, right?  You're the

17  person who sent this e-mail?

18     A.    Correct.  But it was obviously

19  something -- I don't even -- I was -- yes.  I

20  think it might be missing something, but I

21  hear you.  I don't know what we were actually

22  talking about.

23     Q.    If we were to obtain the initial BPO

24  that you submitted for this property from

GERARD R. MADDREY

Page 115

1   Clear Capital or some other source and it

2   showed that the value you put on it was

3   $1,190,000, would you agree then that this

4   was, that's what the "1,19" refers to?

5                   MR. FOLLAND:  Objection.  Go

6        ahead.

7                   THE WITNESS:  I'm not sure.

8        Like I said, I don't recall this -- I

9        don't even recall talking to

10       Mr. Korn, and I'm not really sure

11       what came before.  I'm not sure.

12  BY MR. HULING:

13    Q.   Why did you tell Mr. Korn not to

14  share this e-mail with anyone?

15    A.   I'm not sure.  You know, one thing I

16  stopped doing is -- and, again, I don't

17  remember him or this, but one thing -- you

18  know, I do thousands of properties a year in

19  terms of BPOs.  We get a pretty high volume

20  of them, and what I stopped doing, what I

21  actually -- what I used to do which I thought

22  was a good marketing, would be just good

23  marketing for me, when I went in to do these

24  BPOs, was I always left my card with

GERARD R. MADDREY

Page 116

1    everyone.  And then I stopped doing that

2    because -- and I did it because I said, "oh,

3    well, if they ever have anything real estate

4    related, they know I'm a licensed agent,

5    maybe they'll refer me somewhere", whatever.

6              And I stopped doing it because, A, I

7    wasn't getting referrals out of it.  What I

8    was getting was like harassed about values,

9    people needing a high value for a refinance

10   or something and they want to know why you --

11   you know, they just, they have contact with

12   you.  They want to know -- you know, they're

13   trying to maybe influence the value or

14   something, and you get calls from everyone

15   whatever their purpose is.  You know, they

16   may try to influence what the value might be

17   for whatever purposes they're -- so I stopped

18   giving my card out probably about a year ago.

19   Because you get harassment from people trying

20   to, you know, achieve whatever their end goal

21   is, and I'm like it's too much.

22             So I don't recall this communication,

23   but you know, -- your original question was.

24   Q.    My original question was --

GERARD R. MADDREY

Page 117

1   A.    I'm not sure if I answered it or not.

2   Q.    I'm not sure you did directly either,

3   but that's okay.  You did provide

4   information, and I can just ask you

5   additional questions.

6         I think I asked originally why did

7   you write to Mr. Korn, "Please do not share

8   this e-mail with anyone", and it kind of went

9   from there.  Do you remember now why you

10  would have said that to him?

11  A.    I'm not really sure.  I'm really not

12  sure.  If he reached out to me for some kind

13  of reason, it was probably to get rid of him.

14  Because, you know, like I said, I stopped

15  giving my card out to people so they don't

16  have access to my contact information.  You

17  start getting harassed.

18  Q.    That was about a year ago you said?

19  So 2019 probably?

20  A.    Well, I was probably -- yes.  I had

21  just started doing these in 2016, so no.

22  Q.    So, back then, you were handing out

23  your cards?

24  A.    Probably.

GERARD R. MADDREY

Page 118

1    Q.    And related to what you testified

2  about a minute or so ago, do you feel that

3  you were being influenced in this case, in

4  the 1233 Meadowbank Road case to provide an

5  increased value --

6    A.    No.

7    Q.    -- by Clear Capital or anyone else --

8    A.    No.

9    Q.    -- through Clear Capital?

10   A.    No.  No.  There's no influence in

11  terms of value from any of the vendors I work

12  with.  Sometimes facts and things are

13  presented that I may have overlooked or

14  something, but there's no influence.

15        And I am actually the one doing the

16  report.  I don't have to -- I can state my

17  case as well for any value that I report to

18  any vendor that I do the report for.

19   Q.    In the first sentence of this e-mail

20  where you wrote "the e-mail below is what

21  they sent me to change it to the current",

22  isn't it fair to say that what you were

23  telling Mr. Korn there is this e-mail from

24  Clear Capital on May 15th is what caused you

GERARD R. MADDREY

Page 119

1    to increase the valuation that you were

2    putting on the 1233 Meadowbank Road property?

3      A.    I'm not sure.  I'm not sure.  Like I

4    don't -- what was -- I don't even know what

5    the value of this was.  I mean I'm not sure.

6      Q.    Now, I know you don't remember the

7    specific value.

8      A.    Yes, I don't remember.  I still don't

9    even remember the property.

10     Q.    You mentioned sometimes you were

11   harassed by people as a result of giving your

12   cards out when --

13     A.    Correct.  And this looks like an

14   e-mail that I was just like "leave me alone"

15   type of e-mail.

16     Q.    Right.  But you don't say in this

17   e-mail "please stop contacting me", do you?

18     A.    No, I don't.

19     Q.    You don't say "please don't respond"?

20   You don't say those things, right?

21     A.    No, I don't.

22     Q.    You just tell him "don't take this

23   and share it with anyone else", right?

24     A.    Okay.

Page 120

1    Q.    Is that right?

2    A.    Correct.

3    Q.    And then right before the "thanks"

4    you say to him, "I could lose my license".

5    A.    Okay.

6    Q.    Why did you write that?

7    A.    I'm not sure.

8    Q.    What about this whole interaction

9    would make you worried that your license

10   would be imperiled?

11   A.    Like I said, I was probably -- it

12   doesn't make sense to me.  I was probably --

13   anyone who had ever reached out to me

14   personally about a report it's usually just

15   like "go away" type of e-mail.

16   Q.    But this isn't a "go away" type of

17   e-mail, right?

18   A.    It is for me, yes.  I'm reading it

19   and I know, you know, like "just leave me

20   alone" type of e-mail.

21   Q.    Help me understand why you would say

22   "I could lose my license" to someone to

23   indicate "I don't want to talk, you to

24   contact me again about it".

GERARD R. MADDREY

Page 121

1    A.    Ask that question again, please.

2    Q.    Help me understand why you would

3  write "I could lose my license" on here in

4  the context of this e-mail where you're

5  asking Mr. Korn "please don't share this,

6  this could be bad for me, I could lose my

7  license".  I'm paraphrasing here.  Why would

8  you write that to him?

9          That seems very different than, "You

10  know what, go through my employer or my

11  vendor.  I don't want you to contact me

12  anymore".  You could have written that --

13    A.    Right.

14    Q.    -- and you didn't.  So I'm trying to

15  understand better why you would write this.

16  Because it doesn't make sense to me.

17    A.    I'm not sure.  I don't remember the

18  interaction or -- you know, I don't have an

19  answer for you.

20    Q.    Would you agree that it sounds like

21  you're expressing discomfort in this e-mail

22  with what Clear Capital has asked you to do?

23              MR. FOLLAND:  Objection.

24              THE WITNESS:  No.

GERARD R. MADDREY

Page 122

1           Clarifications are pretty normal, and

2           you know, this was one -- they're

3           pretty normal.  So, like I said,

4           40 percent of orders come back on

5           clarifications, and some of them have

6           to do with -- it has to do with a lot

7           of things.  Value is one of them.

8           I'm pretty used to it.  So I'm not --

9           there's no pressure to do one thing

10          or another.  No, that's definitely

11          not the case.

12   BY MR. HULING:

13     Q.   It sounds like that clarification

14   requests are very normal from what you

15   testified to today.  So that makes me wonder

16   why responding to one would ever cause you to

17   write "don't share this fact with anyone that

18   I got this clarification request because I

19   could lose my license over it".  That's what

20   I'm not understanding from you.

21               MR. FOLLAND:  Objection.

22   BY MR. HULING:

23     Q.   Can you explain why a clarification

24   request, which you've testified is very

GERARD R. MADDREY

Page 123

1    typical, would cause you to be fearful that

2    your license could be lost as a real estate

3    agent?

4       A.    I don't think I was talking about the

5    clarification request.

6       Q.    When you wrote "this is for your

7    information only", what did "this" refer to

8    if not the clarification request?

9       A.    I'm not sure what else happened in

10   this exchange between me and Mr. Korn.   I

11   know this isn't the only, if it was

12   communication.   Like I said, this is

13   definitely missing some pieces here.

14          And like I said, one of the big

15   reasons I stopped giving out my card was

16   because people would start harassing me about

17   trying to get certain values wherever they

18   needed them to be.   So, like I said, a lot of

19   times when that happened I just -- you know,

20   my goal was just to make sure they go away,

21   and for them to go away, it's just sometimes

22   I tell them anything and just get them out,

23   get them -- just, you know, --

24       Q.    Could you lose your real estate

GERARD R. MADDREY

                                            Page 124

1    license if you allowed an outside party to

2    influence your professional opinion on a BPO?

3       A.    I don't think so.

4       Q.    So it would not imperil your license?

5       A.    I don't think so, no.

6       Q.    So does it happen that people

7    influence the value you put?

8       A.    They don't.

9       Q.    But they could, and it wouldn't be a

10   problem for you to go along with that?

11      A.    People, like I said, people do all

12   kind of different things.  You'll walk into a

13   house and they'll hand you a bunch of comps

14   and stuff.  That goes to the side.  You can't

15   consider that.  It's based on the market, and

16   you know, pretty much what it is.  There's no

17   influence from outside people.

18      Q.    You've never experienced any

19   influence.  Is that what you're saying now?

20              MR. FOLLAND:  Objection.

21   BY MR. HULING:

22      Q.    I'm just trying to understand.

23      A.    I'm trying to understand your

24   question.  My question is yes, people do try,

GERARD R. MADDREY

Page 125

1   will try to talk to you on influencing an

2   appraisal, absolutely.

3     Q.    And if you allowed that to influence

4   your appraisal, is your testimony that that

5   would be okay, you would not lose your

6   license for letting that happen?

7     A.    I haven't allowed that to happen.

8     Q.    Have you ever done anything else in

9   and around May 2017 that would have caused

10  you to fear that your real estate license

11  would be lost?

12              MR. FOLLAND:  Objection.

13              THE WITNESS:  I don't really

14        know how to answer that.  No.  The

15        answer is no, I guess.

16  BY MR. HULING:

17    Q.    You testified earlier, I believe,

18  that you did not recall ever having any

19  contact with Mr. Korn either in writing or in

20  person.  Is that correct?

21    A.    I don't recall it, no.

22    Q.    But you just testified within the

23  last five minutes that not only did you have

24  this communication that we see in front of

GERARD R. MADDREY

Page 126

1    you but you're saying it's definitely missing

2    some pieces.  Does that mean that you now --

3        A.    This doesn't make sense to me is what

4    I'm telling you.

5        Q.    Do you recall other communications

6    with Mr. Korn other than this one in writing?

7        A.    I don't recall.

8        Q.    Do you recall the fact that there

9    were some even if you don't remember exactly

10   what they were and what they say?  Do you now

11   remember having seen this?

12       A.    I don't remember, right.

13       Q.    Do you remember whether you had oral

14   conversations with Mr. Korn either in person

15   or on the telephone?

16       A.    Don't remember.

17       Q.    You don't know if they even --

18       A.    I don't remember Mr. Korn, yes.

19       Q.    But you think that -- your testimony

20   was you think there are other communications?

21                 MR. FOLLAND:  Objection.

22   BY MR. HULING:

23       Q.    Is that fair to say?

24                 MR. FOLLAND:  Objection.

Page 127

1                    THE WITNESS:  I don't have an

2          answer for that.

3    BY MR. HULING:

4      Q.    What did you mean when you testified

5    that there definitely are some missing

6    pieces?

7                    MR. FOLLAND:  Objection.

8                    THE WITNESS:  What I'm saying

9          is this looks like an e-mail, I would

10          say, that I would -- someone was

11          harassing me about a value, and I

12          just told them anything to get rid of

13          them.

14    BY MR. HULING:

15      Q.    Do you see anything on Maddrey-7 that

16    you would point to that shows an example of

17    being harassed by Mr. Korn?

18      A.    Again, I've been harassed by many

19    people just in my times of doing values.  So

20    I know how I respond to just get them off my

21    back and get them away.  I don't have any --

22      Q.    Have you told other people who were

23    harassing you that you could lose your

24    license?

GERARD R. MADDREY

Page 128

1    A.     I don't know.

2    Q.     I'm going to show you what will be

3    Maddrey-8.

4                        -  -  -

5      (Maddrey-8 marked for identification.)

6                        -  -  -

7    BY MR. HULING:

8      Q.     Maddrey-8 is spread out over five

9    pages.  It's a printout of text messages, and

10   the way it's formatted it looks like there's

11   some duplication the way it continues from

12   one page to the next.  But, please, it's not

13   a large volume, so just -- I'd ask if you can

14   just take a moment to look at that to see if

15   you recognize it.

16   A.     Okay.

17   Q.     Beginning on Page 1, there's a text

18   message that reads, "Hi Scott.  Again, I am

19   not suppose to be talking to anyone in

20   regards to reports and numbers or anything.

21   I normally get like 30 orders a week and I

22   got 2 so far (after yesterday's call now I

23   know why).  This is my biggest client and

24   makes up about 70 percent of my business and

GERARD R. MADDREY

Page 129

1   earnings.  Please leave me out of this

2   battle.  I was just being nice cause you

3   seemed like a nice guy and now I'm under

4   investigation.  Again please leave me out of

5   it.  Thanks Gerry".

6           Did I read that correctly?

7   A.    Correct.

8   Q.    And is that in a text message that

9   you sent to Scott Korn on June 14, 2017 at

10  6:03 a.m.?

11  A.    I guess.

12  Q.    And what are you referring to when

13  you say "I normally get like 30 hours (sic) a

14  week and I got 2 so far"?

15            MR. FOLLAND:  Objection.

16            THE WITNESS:  I don't know.

17        But it seems like Scott was, just as

18        I said in the previous, looking at

19        the previous statement, he was

20        probably harassing me, period.

21        That's what it looks like to me.  And

22        that's why I stopped giving people my

23        card.  Because not only this, it's

24        people just -- they just hound you

GERARD R. MADDREY

Page 130

1          forever.

2                    And I don't know what they got

3          going on in the background, but leave

4          me out of it.  I did the report.  The

5          value is in.  Leave me alone.  And he

6          was probably harassing me.  That's

7          what this looks like.

8   BY MR. HULING:

9     Q.    But these are your words to him

10   and --

11    A.    I'm understanding that.

12    Q.    It sounds like --

13    A.    Yes, and leave me out of whatever you

14   got going on behind the scenes.  I did the

15   report.  I did the value.  Leave me out of

16   it.  I don't have anything to do with it.

17            Like he was harassing me, and that's

18   probably exactly what was happening.  He --

19   and that's what people do.  That's just

20   why -- and I thought it was good for

21   marketing.

22            But people, everyone has a reason

23   they're doing these reports.  I'm not

24   privileged to that information.  I still

GERARD R. MADDREY

Page 131

1   don't know what's going on with this guy.

2   But he, obviously, he was harassing me.  And,

3   yes, I told him to leave me alone, and that's

4   just what I was telling him, leave me alone.

5       Q.    You did write, "Please leave me out

6   of this battle"?

7       A.    Leave me, whatever you're doing, I

8   don't even know what he was doing, but leave

9   me out of this.  Now that I'm seeing, it's

10  harassment.  That is get out of -- leave me

11  alone.  Keep me out of this.  I did the

12  report.  It's an honest report based on the

13  values in the neighborhood.  That's all I can

14  do.  I get paid 70 bucks to do this thing, 40

15  bucks, whatever it was.  Leave me out of

16  this, whatever your endgame is and whatever

17  you're trying to accomplish.  I don't have

18  anything to do with that.  I did the report

19  and based on what's going on in the

20  neighborhood.

21          Now, he was probably harassing me,

22  and that's exactly what this says to me.  If

23  this is a text back and forth, he was

24  harassing me, and that's what happens.  He's

GERARD R. MADDREY

Page 132

1   not the only one.

2      Q.    Again, I want to ask you about what

3   you wrote to him, --

4      A.    I'm here.

5      Q.    -- specifically where you said, "I

6   normally get like 30 orders a week and I got

7   2 so far".

8      A.    Okay.

9      Q.    It sounds like you're experiencing

10  some negative professional repercussions in

11  this time period from your largest customer.

12     A.    I don't know what that meant to be

13  quite honest, but I do know if I said "leave

14  me out of it" he was harassing me and I don't

15  know what exactly he was harassing me about.

16  And I don't even know what his case is about,

17  but leave me out of it.  The report is done,

18  it's in, and it's an honest report of the

19  neighborhood.

20          I don't know what your end goal is,

21  but I'm not -- whatever the case may be, if I

22  said leave me out of it, that means he had

23  been harassing me.  This is probably not the

24  only messages to be quite honest if --

GERARD R. MADDREY

Page 133

1    Q.    Do you recall other messages?

2    A.    I don't.  I don't even have these,

3    but --

4    Q.    Did you use the word "harass"

5    anywhere in this text message?

6    A.    It looks like harassment to me.  And

7    I'll tell you what, if I'm talking like this,

8    it's harassment.

9    Q.    Did you use the word "harass"

10   anywhere in this?

11   A.    No.  But I'm telling you if I

12   wrote -- I know how I talk and how I speak

13   and what comes from me, and this is an

14   example, like I said earlier, of someone who

15   was harassing me after the fact.  Either they

16   got the appraisal back from the end borrower

17   and they had my card and they don't

18   understand that it's a vendor in the middle

19   or they think I'm an actual appraiser, and

20   then they harass me about it.

21        I don't -- you know, that's just why

22   I stopped giving out my information.  I just

23   -- right now I show up to a house and do a

24   report.  I say, "Hey, I'm here to take photos

GERARD R. MADDREY

Page 134

1   for the valuation", and I don't give them

2   anything.

3      Q.    Do you recall a period of time when

4   your solicitations from Clear Capital went

5   from 30 orders a week to 2?

6      A.    I don't know if I was even talking

7   about that.  No, I don't, not back then.

8   Again, I get solicitations from a lot of

9   different vendors.  I have no idea what my

10  workflow was back then.  And sometimes if one

11  is low, one is high; if one is low, the other

12  is high.  It balances out.

13     Q.    You wrote in this text message that

14  you have a biggest client that makes up about

15  70 percent of your business, right?  You

16  wrote that.

17     A.    Right.

18     Q.    Who was that a reference to?

19     A.    Don't know.

20     Q.    What you just said was that there are

21  a lot of different clients, some are low,

22  some are high, but it sounds like in June of

23  2017 there was one predominant client that

24  you had that made up 70 percent of your

GERARD R. MADDREY

Page 135

1   business, correct?

2      A.    And I'm not sure, yes.  I really

3   can't accurately say that.  And, again,

4   whatever I said in this thing was for him or

5   whoever that was contacting me to leave me

6   alone.  It doesn't necessarily even all have

7   to be true here.  It was just, "Leave me

8   alone.  You are" -- someone was obviously

9   harassing me.

10     Q.    You absolutely wrote, "Please leave

11  me out of this battle".

12     A.     "Leave me alone.  Just leave me" --

13  and that's just why I stopped giving my card

14  out, for this type of stuff.  Because people,

15  everyone has something going on.

16     Q.    But you didn't write "please leave me

17  alone" in a vacuum in this text, right?

18     A.    Same.  It means the same thing, leave

19  me alone.

20     Q.    But you wrote "please leave me out of

21  this battle" after writing, I'm paraphrasing

22  now, this is hurting me professionally.  You

23  wrote my largest client that makes up

24  70 percent of my business and earnings has

Page 136

1  gone from giving me a lot of business to very

2  little business, right?

3          MR. FOLLAND:  Objection.

4          THE WITNESS:  I don't know what

5     that's actually referencing to even

6     -- to be quite honest.

7  BY MR. HULING:

8   Q.   You don't know as you sit here today

9  who you were referencing in June 2017 when

10  you referred to them as your biggest client

11  that makes up 70 percent of your business and

12  earnings.  Is that what you're telling me?

13  A.    Correct.  I just see this, I see my

14  response to someone that was harassing me

15  about a particular value they were seeking

16  that maybe wasn't what they or -- and you

17  know what, they're coming at -- you know, he

18  needs to be going not after me, after the

19  bank to get some kind of authorization on the

20  value, not me.

21       I just report it as I see it.  Like I

22  said, it seems like he was harassing me.

23  Q.   Now, you sent that text, I don't

24  know, about four weeks after the e-mail you

GERARD R. MADDREY

Page 137

1   had sent him that we looked at in Maddrey-7.

2   A.    Harassment, yes.  He was probably

3   texting me all throughout -- that's what

4   happens, and I don't remember this case

5   particularly and I don't have any reference

6   to it.  But exactly, if that time frame

7   lapsed and he still was trying to get some

8   type of, you know, -- but I'm, again, they

9   don't understand I'm not an appraiser.  But

10  not just him, it happens, and --

11  Q.    And you have no specific recollection

12  of him?  You're surmising it based on your

13  words in these messages, correct?

14  A.    Correct.  I don't know who -- I don't

15  even know what we were talking about.  But

16  like if it was four weeks after and we're

17  still -- like I don't -- I get paid 40 bucks

18  for a drive-by appraisal, 70 for an interior.

19  You think I'm going to be spending that much

20  time on this four weeks later?  I was being

21  harassed.

22  Q.    And you certainly wouldn't want it to

23  impact your business negatively, would you?

24  A.    What's that?

GERARD R. MADDREY

Page 138

1    Q.    The dispute that arose out of a

2    single BPO for which you earned very little

3    money, you wouldn't want that to impact your

4    business negatively, right?

5    A.    Correct.  And it hasn't impacted my

6    business.  I didn't even know this was going

7    on to be quite honest.

8    Q.    But at the time, you wrote that it

9    was, correct?

10   A.    It doesn't mean it was necessarily

11   true.  Just it was probably just a "go away"

12   message to leave me alone.  Like --

13   Q.    To go back to the question, this was

14   sent about four weeks after the prior e-mail

15   where you told him "don't share the e-mail

16   with anyone, this is for your information

17   only, I could lose my license", correct?  The

18   time, about four weeks after you sent that,

19   you sent this, correct?

20   A.    Correct.  And was he sending me stuff

21   in between is what I -- I mean we don't know

22   that either.

23   Q.    You said you don't remember.

24   A.    I assume he was and it was

GERARD R. MADDREY

Page 139

1   harassment.  Like I probably blocked or

2   ignored it.  That's what you have to do to

3   some --

4      Q.    Is it your recollection that he

5   didn't honor your request not to share it

6   with anyone and in fact had shared it with

7   someone in between May 19th and June 14th and

8   it was causing negative ramifications for

9   your business?

10     A.    No.  I don't -- there's up- and

11  downturns with all these companies.  The

12  volumes, you know, it's different times of

13  year where it's up, different times where

14  it's down.

15          There's never been a time where

16  anything has happened to me that my -- no,

17  this probably was just something I was

18  just -- like, to leave me alone.  It

19  definitely -- there's high volume periods.

20  There's low volume periods.  It just depends

21  like I said.

22          I might be getting something from

23  this vendor, and then this vendor all of a

24  sudden it's a whole bunch of stuff that I'm

GERARD R. MADDREY

Page 140

1    doing for him.  It goes back and forth.  So I

2    don't --

3       Q.    You have no recollection of --

4       A.    No.

5       Q.    -- losing that much business --

6       A.    No.

7       Q.    -- from a client that was 70 percent

8    --

9       A.    No.  My income has been pretty

10   consistent since, you know, for a while now.

11   So no.

12      Q.    Including during 2017?

13      A.    Yes.  Yes.  I've never had a downturn

14   in business.  Like I said, it balances out

15   between vendors.

16      Q.    And have you ever had a time period

17   where one client was representing such a

18   large share of your business as you said in

19   that text?

20      A.    I don't think anyone represent- -- I

21   have a few clients that I get kind of equal

22   type of --

23      Q.    So you never had one that was

24   70 percent of your business?

GERARD R. MADDREY

Page 141

1     A.     No.

2     Q.     Let's turn to a later text in this

3   string that begins on the fourth page of this

4   document where you wrote, "This is the rules

5   and grounds for termination.  I told you this

6   and you gave me your word your lips were

7   sealed.  Please provide me an update

8   tomorrow.  You gave me your word".

9     A.     Who wrote that to who?

10     Q.     Is that a text you received from

11   Scott Korn?

12     A.     I don't know what we're talking

13   about.  Yes, I don't know.  I'm asking you.

14     Q.     I'm asking you do you recall

15   receiving that text from Scott Korn?

16     A.     I don't recall this.

17     Q.     Do you recall sending that text to

18   Scott Korn?

19     A.     I don't recall either.  I don't even

20   know what we're talking about to be quite

21   honest.  But I think it's a case what I

22   stated earlier and I was being harassed from

23   somebody for whatever purpose they needed a

24   specific number for, and I was just trying to

GERARD R. MADDREY

Page 142

1    get rid of him.

2      Q.    Do you feel like you provided Scott

3    Korn information you shouldn't have and he

4    betrayed your trust?

5      A.    Not sure.  I'm not sure what

6    happened, you know.  Yes, I'm not sure.

7      Q.    Has Clear Capital at any time when

8    you've held a real estate license asked you

9    to do something which made you worried you

10   could lose your license if you complied with

11   it?

12     A.    No.

13     Q.    Has any other vendor or client you

14   deal with made such a request to you that you

15   were worried if you did what they asked you

16   would lose your real estate license?

17     A.    Lose my real estate license, no.

18     Q.    I'm going to show you what we'll mark

19   as Maddrey-9.

20                  -   -   -

21     (Maddrey-9 marked for identification.)

22                  -   -   -

23   BY MR. HULING:

24     Q.    Have you had a chance to look at

GERARD R. MADDREY

Page 143

1    Maddrey-9?  I'm sorry, I'll give you time if

2    you need it.

3       A.    I read it, yes.

4       Q.    Maddrey-9 is an e-mail that was sent

5    two weeks after the first text message we

6    looked at in Maddrey-8, correct?

7       A.    Okay.

8       Q.    Is that right?

9       A.    Correct.

10      Q.    And it's an e-mail you wrote to Scott

11   Korn that says, "I spoke to them.  So my

12   guess is you will not call me back or honor

13   your word and will proceed litigation with",

14   quote, "your evidence", end quote, "and screw

15   me and my family after I was very kind to you

16   and tried to help you", correct?

17      A.    Yes.

18      Q.    Why did you write that e-mail to

19   Scott Korn on June 28, 2017?

20      A.    I don't remember.  I don't remember

21   this at all.

22      Q.    It's consistent with the fact that

23   you confided information in him that you

24   thought he would keep secret and he didn't,

GERARD R.  MADDREY

Page 144

1   correct?

2                   MR. FOLLAND:  Objection.

3                   THE WITNESS:  I'm not sure.  To

4        be quite honest, this is --

5   BY MR. HULING:

6     Q.   You're referencing him not honoring

7   his word, correct?

8                   MR. FOLLAND:  Objection.

9                   THE WITNESS:  Right.  I'm not

10        sure what that is.

11   BY MR. HULING:

12     Q.   You're referencing that he's done

13   something to screw you and your family after

14   you had been very kind to him.

15     A.   And I don't know what that is.  I

16   don't know what I'm -- I don't know what this

17   is.

18     Q.   It sounds like maybe that you had

19   provided him with information about the BPO

20   that was conducted on his property at 1233

21   Meadowbank Road and he then shared it with

22   people you asked him not to.  Isn't that

23   right?

24                   MR. FOLLAND:  Objection.

GERARD R. MADDREY

Page 145

1                    THE WITNESS:  I don't have an

2          answer to that.  To be quite honest,

3          I don't know exactly what I'm talking

4          about here.  "Screw me and my

5          family"?  Don't know.

6    BY MR. HULING:

7     Q.    Does seeing Maddrey-9 refresh your

8    recollection at all as to any professional

9    struggles or ramifications that you were

10   going through in this time period with regard

11   to your business or clients?

12    A.    Could you ask that again?

13    Q.    Yes.  Having seen Maddrey-9 and

14   reading it, does that refresh your

15   recollection about whether in this May and

16   June time period of 2017 you were

17   experiencing negative repercussions in your

18   professional life?

19    A.    No.

20    Q.    Why would you reference your family

21   and yourself being screwed after you had been

22   very kind and tried to help Mr. Korn?

23    A.    I'm not sure.  Again, nothing

24   happened to me and my family, so I'm not

GERARD R. MADDREY

Page 146

1   sure.

2      Q.     Do you remember being kind and trying

3   to help Scott Korn on any occasion?

4      A.     I'm kind to everybody.  I speak to

5   everyone pretty nice.  People are nice to me,

6   I'm nice to them.  But I don't recall

7   anything outside the box.

8      Q.     But even anything specific at all?

9   Do you recall something kind or help that you

10  tried to provide to Scott Korn at any time?

11     A.     No.

12     Q.     You don't even remember your

13  interactions with Scott Korn, right?

14     A.     I don't remember him.

15     Q.     Until you saw these e-mails and

16  texts, you didn't remember --

17     A.     And I still don't remember him.  I

18  just think it's a case of harassment, which

19  has happened with many people I've done

20  reports for.

21     Q.     When you searched for things that

22  would have been responsive to the requests in

23  the Subpoena, did you search your phone for

24  any text messages that might relate to this

GERARD R. MADDREY

Page 147

1    property?

2      A.    Text messages?

3      Q.    Yes.

4      A.    I don't think so.

5      Q.    You don't think you searched for

6    them?

7      A.     Wait.  I searched for e-mails, texts.

8    Yes, I searched all the people involved in

9    the case.  So yes.

10      Q.    Did you locate any text messages back

11    or forth with Scott Korn as a result of

12    looking for the documents responsive to the

13    Subpoena?

14      A.    No.

15      Q.    Did you find any e-mails between you

16    and Scott Korn when you searched?

17      A.    No.

18      Q.    Do you follow any organized personal

19    procedure with regard to deleting old e-mails

20    that you maintain from your e-mail account?

21      A.     Not regular procedures, but you know,

22    no.  I'm not sure if I got a new phone

23    sometimes.  I don't know.  Yes, I don't.  I'm

24    not really keeping track of that type of

GERARD R. MADDREY

Page 148

1   stuff.  Nothing happens on my phone, but you

2   know, --

3     Q.    You don't have a set time limit where

4   you say "I go back and delete everything

5   that's more than two-years old or three-years

6   old" or anything?

7     A.    No.  I have had exercises before

8   where if my memory is getting full I'll go

9   delete old pictures and stuff like that, but

10  that's about it.

11    Q.    Now, in Maddrey-7, the e-mail you

12  sent on May 19, 2017, that was sent from an

13  e-mail address

14  gerard.maddrey@elitepremierproperties.com,

15  correct?

16    A.    Okay.

17    Q.    That's what it says, right?

18    A.    Right.

19    Q.    That's an e-mail address you used to

20  use when you were affiliated with Elite,

21  correct?

22    A.    Correct.

23    Q.    You no longer have access to any

24  e-mails sent to or from that box --

GERARD R. MADDREY

Page 149

1    A.    No.

2    Q.    -- based on what you said earlier.

3  Is that correct?

4    A.    Correct.

5    Q.    In Maddrey-9, the most recent one we

6  looked at, that was an e-mail that you sent

7  from an e-mail address of

8  gmaddrey3@gmail.com.  Do you see that?

9    A.    Okay.

10    Q.    Is gmaddrey3@gmail.com a personal

11  e-mail address that you use?

12    A.    Yes.

13    Q.    Do you still use that e-mail address

14  today?

15    A.    Yes, I do.

16    Q.    And did you search your Gmail

17  account, gmaddrey3, for e-mails related to

18  Scott Korn?

19    A.    I did.

20    Q.    And did you search for e-mails in

21  that e-mail box for gmaddrey3@gmail.com for

22  ones that would relate to 1233 Meadowbank

23  Road?

24    A.    Correct.

GERARD R. MADDREY

Page 150

1    Q.    And you didn't find any?

2    A.    Nothing.

3    Q.    But you still maintain the account

4    actively?

5    A.    Correct.

6              MR. HULING:  If we can maybe

7         take a short break, I'll just check

8         my notes, and we might be very close

9         to my being concluding questions.

10                  -  -  -

11    (A recess occurred from 12:49 to 12:54.)

12                  -  -  -

13   BY MR. HULING:

14    Q.    Have you had any contact either on

15   the phone or in person or in writing with a

16   person named Joseph Krause that works for

17   Caliber?

18    A.    No.

19    Q.    Ever recall any communication with

20   them?

21    A.    No.

22    Q.    Do you recall any communication with

23   anybody at Caliber about the BPO on 1233

24   Meadowbank Road?

GERARD R. MADDREY

Page 151

1    A.    No, not at all.

2    Q.    Did anyone at Clear Capital ever

3  express to you that people at Caliber were

4  making certain requests with regard to the

5  BPO --

6    A.    No.

7    Q.    -- at 1233 Meadowbank Road?

8    A.    No.

9    Q.    Having reviewed the documents you

10  reviewed today and testified about the

11  subjects you've been testifying about, does

12  anything refresh your recollection that what

13  occurred here was that you submitted an

14  initial valuation for the property at 1233

15  Meadowbank Road of $1.19 million and later

16  increased that valuation to $1.4 million?

17             MR. FOLLAND:  Objection.

18             THE WITNESS:  No.

19  BY MR. HULING:

20    Q.    Do you have any recollection of any

21  valuations that you did with respect to 1233

22  Meadowbank Road at this time?

23    A.    No.

24             MR. HULING:  I have no further

GERARD R. MADDREY

Page 152

1        questions.

2               MR. FOLLAND:  No questions from

3        me.  Thank you.  Thank you,

4        Mr. Maddrey.

5               MR. HULING:  Mr. Maddrey, thank

6        you very much.

7                      -   -   -

8               (Witness excused.)

9        (Deposition concluded at 12:55 p.m.)

10                     -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

GERARD R. MADDREY

Page 153

1

2                    CERTIFICATE

3

4

5          I HEREBY CERTIFY that the

6    witness was duly sworn by me and that the

7    deposition is a true record of the testimony

8    given by the witness.

9

10

11

12

13          Kimberly S. Gordon, a

14          Registered Professional Reporter,

15          Certified Court Reporter

16          and Notary Public

17          Dated:  MARCH 6, 2020

18

19

20               (The foregoing certification

21    of this transcript does not apply to any

22    reproduction of the same by any means,

23    unless under the direct control and/or

24    supervision of the certifying reporter.)

GERARD R. MADDREY

Page 154

1                    INSTRUCTIONS TO WITNESS

2

3

4                    Please read your deposition

5     over carefully and make any necessary

6     corrections.  You should state the reason in

7     the appropriate space on the errata sheet

8     for any corrections that are made.

9                    After doing so, please sign

10    the errata sheet and date it.

11                   You are signing same subject

12    to the changes you have noted on the errata

13    sheet, which will be attached to your

14    deposition.

15                   It is imperative that you

16    return the original errata sheet TO THE

17    DEPOSING ATTORNEY within thirty (30) days of

18    receipt of the deposition transcript by you.

19    If you fail to do so, the deposition

20    transcript may be deemed to be accurate and

21    may be used in court.

22

23

24

GERARD R. MADDREY

Page 155

```
 1                    -   -   -   -   -   -
                      E  R  R  A  T  A
 2                    -   -   -   -   -   -

 3      PAGE   LINE   CHANGE

 4      _____  _____  _____

 5      _____  _____  _____

 6      _____  _____  _____

 7      _____  _____  _____

 8      _____  _____  _____

 9      _____  _____  _____

10      _____  _____  _____

11      _____  _____  _____

12      _____  _____  _____

13      _____  _____  _____

14      _____  _____  _____

15      _____  _____  _____

16      _____  _____  _____

17      _____  _____  _____

18      _____  _____  _____

19      _____  _____  _____

20      _____  _____  _____

21      _____  _____  _____

22      _____  _____  _____

23      _____  _____  _____

24      _____  _____  _____
```

Page 156

1                ACKNOWLEDGMENT OF DEPONENT

2

3

4              I,_____, do

5    hereby certify that I have read the

6    foregoing pages,  1 - 156, and that the same

7    is a correct transcription of the answers

8    given by me to the questions therein

9    propounded, except for the corrections or

10   changes in form or substance, if any, noted

11   in the attached Errata Sheet.

12

13

14   _____

15    GERARD R. MADDREY                    DATE

16

17

18

19   Subscribed and sworn
     to before me this
20   _____ day of _____, 20_____.

21   My commission expires:_____

22

23   _____
     Notary Public

24